James RUTKIN, Plaintiff-Respondent,

v.

Joseph REINFELD, Samuel Bronfman and Allen Bronfman, individually, and as co-partners doing business under the style and name of Bronfman Interests and Browne-Vintners Co., Inc., Renfield Importers, Ltd., and Harold C. (Sonny) Levin, also known as Harold C. Renfield, Defendants-Appellants.

No. 14, Docket 23455.

United States Court of Appeals Second Circuit.

Argued Nov. 7, 1955.

Decided Jan. 25, 1956.

Theodore Kiendl, New York City (Davis, Polk, Wardwell, Sunderland & Kiendl; William R. Meagher, New York City, of counsel, on the brief), for defendants-appellants Joseph Reinfeld, Renfield Importers, Ltd. and Harold C.

(Sonny) Levin also known as Harold C. Renfield.

Lowell Wadmond, New York City (White & Case, Thomas Kiernan and William D. Conwell, New York City, of counsel, on the brief), for defendants-appellants Samuel Bronfman, Allen Bronfman and Browne-Vintners Co. Inc.

Maurice Edelbaum, New York City (Clarence Fried, Edwin F. Russo and Edward Halle, New York City, of counsel, on the brief), for plaintiff-respondent.

Before CLARK, Chief Judge, and LUMBARD and WATERMAN, Circuit Judges.

LUMBARD, Circuit Judge.

From a judgment against them on a jury verdict for $77,200, which with interest from January 15, 1947 totals $115,116.69, the four individual and two corporate defendants appeal on numerous grounds. We consider two of those grounds sufficient to require reversal of the judgment—namely, the failure to bring suit within the applicable limitation period and the fact that the plaintiff's claims for damages arise from alleged fraud concerning the fruits of partnerships conducted in violation of law.

The jury having found that the defendants had conspired to the plaintiff's injury as stated in the pleadings, a summary of the pleadings sufficiently poses the questions which are determinative of this appeal. Such evidence as is material to the two grounds of our decision will be further stated.

### The 1948 Complaint and the 1951 Supplemental Complaint

On July 1, 1948 Rutkin filed his complaint invoking federal jurisdiction because of citizenship diverse from the defendants therein named, Joseph Reinfeld; Samuel, Abraham, Harry and Allen Bronfman; and Distillers Corporation Seagrams, Ltd. The complaint made these allegations: Rutkin and Reinfeld had been partners prior to May 1931 and had equal shares in a plan to purchase and operate L. L. & B. Distillers, Ltd., a distillery in Ontario, Canada. Reinfeld commenced negotiations with L. L. & B. to finance and purchase a controlling interest and on July 2, 1931 he agreed for the partnership to invest $500,000, including the purchase of a first and second mortgage on the distillery. He purchased the first mortgage and made payments on the second mortgage. On the next day Reinfeld conspired with Samuel and Allen Bronfman to enrich himself and them and to deprive Rutkin of his share of the profits. To induce Reinfeld to break his agreement with L. L. & B. the Bronfmans gave Reinfeld stock of Distillers-Seagrams and "other emoluments" and all agreed to keep this secret from Rutkin. This was of benefit to the Bronfmans because L. L. & B. was in competition with the Bronfman company, Distillers-Seagrams. The distillery was sold on the second mortgage foreclosure; the stock which Reinfeld had acquired was sold to a Bronfman nominee; and Reinfeld was to be indemnified against any loss or expense.

Reinfeld advised Rutkin that the partnership interest in L. L. & B. had been sold to the Bronfmans for the amount the partnership had paid for it and that it had been done in good faith. Reinfeld thus falsely represented the situation to Rutkin to prevent his inquiry so that the fraud was not discovered until May 27, 1946. Rutkin, never having received his share of the benefits from Reinfeld, asked $22,000,000 damages.

The supplemental complaint, filed November 13, 1951, joined Browne-Vintners Co., Inc., Renfield Importers, Ltd., and Harold C. Levin, also known as Harold C. Renfield, as additional defendants. It alleged that: Rutkin and Reinfeld as partners owned a majority interest in Reinfeld's name and in the names of dummies in the Browne-Vintners Co., Inc., a New York corporation in existence from 1933 until 1940 (referred to as Browne-Vintners Old). The defendants agreed in December 1940

that Reinfeld would cause the business and assets of Browne-Vintners Old, including the Cointreau, Piper Heidsieck and Remy Martin agencies which it held, to be sold to Distillers-Seagrams for an inadequate price, and the proceeds of the sale were distributed to the stockholders of Browne-Vintners. Reinfeld received secret emoluments which the defendants fraudulently concealed from the plaintiff. Rutkin did not discover until after July 1, 1948 that the Cointreau, Piper Heidsieck and Remy Martin agencies had been transferred to Renfield Importers, Ltd. of New York which was controlled by Reinfeld and defendant Harold C. Renfield, and Rutkin did not receive his share of these benefits. This transfer of the agencies was without Rutkin's knowledge and it was part of the consideration to Reinfeld for his 1931 double-dealing on the L. L. & B. transaction. Reinfeld concealed from Rutkin the extent of Rutkin's interest in Browne-Vintners Old and fraudulently caused Rutkin to execute a general release as a result of which certain payments were made to Rutkin.

Further allegations that the defendants caused Rutkin's conviction for violation of the federal income tax laws, Rutkin v. United States, 1952, 343 U.S. 130, 72 S.Ct. 571, 96 L.Ed. 833 are not pertinent here as they were dismissed by the trial judge.

The defendants' answers, in addition to general denials, pleaded affirmative defenses of the limitations statutes of New York and Canada, an assignment to Reinfeld of Rutkin's interest in Browne-Vintners Old and a release executed by Rutkin in 1943.

Upon the argument of motions to dismiss at the end of plaintiff's proof the defendants also urged the illegality of the L. L. & B. and the Browne-Vintners Old transactions, and this was again urged at the conclusion of all the evidence.

The trial judge, although he refused to submit to the jury special questions regarding the illegality of the L. L. & B. and the Browne-Vintners Old transac-

tions as requested by counsel for the Bronfmans, did put to the jury special questions bearing upon the statutes of limitations defenses which the jury answered thus:

1. With respect to the L. L. & B. transaction:

(A) The claim arose December 15, 1931.

(B) Plaintiff became aware of the claim in May 1946.

(C) Plaintiff should have become aware of the claim in the exercise of reasonable care between December 1931 and December 1932.

2. With respect to the Browne-Vintners Old transaction:

(A) The claim arose December 20, 1940.

(B) Plaintiff did not become aware of the claim until January 1948.

(C) Plaintiff should have become aware of the claim in the exercise of reasonable care some time in 1947.

The trial judge, having reserved decision on the motions to dismiss made at the close of plaintiff's case, and later at the close of all the evidence, gave further consideration to those motions together with timely motions to set aside the verdict and enter judgment in favor of the defendants. He denied all the motions in an opinion reported at 122 F. Supp. 265.

### The Application of the Statutes of Limitation

■ Since jurisdiction in this case is based on diversity of citizenship we must apply the New York law in determining which statute of limitations to apply. Klaxon Company v. Stentor Electric Manufacturing Co., 1941, 313 U.S. 487. Section 13 of the New York Civil Practice Act provides that where a cause of action accrues outside New York and the plaintiff is not a resident of New York, the claim cannot be asserted if barred by the limitations statute of either New York or the place where the action arose. Although it appears here that the L. L. & B. claim would be barred by a Canadian stat-

ute shorter than that of New York, we need not rule on that point since both claims asserted by the plaintiff are barred by the applicable New York statutes.

The trial judge applied the New York statute of six years, New York Civil Practice Act, § 48, subd. 5, to what he described as the jury's finding of a single conspiracy which continued from 1931 to 1947 and held that the statute ran from some time in 1947, the time when the jury found that the plaintiff in the exercise of reasonable care should have been aware of the Browne-Vintners Old transaction. The judge applied the rule of criminal conspiracy where the statute runs from the last overt act. We cannot agree with this application of the law to the facts of this case.

■ Section 11 of the New York Civil Practice Act provides that periods of limitation must be computed from "the time of the accruing of the right to relief by action, special proceeding, defense or otherwise * * *" The damage for which recovery may be had in a civil action is not the conspiracy itself but the injury to the plaintiff produced by specific overt acts. Nalle v. Oyster, 1913, 230 U.S. 165, 182, 33 S.Ct. 1043, 57 L.Ed. 1439; Lewis Invisible Stitch Mach. Co. v. Columbia Blindstitch Mach. Mfg. Corp., 2 Cir., 1936, 80 F.2d 862, 864. The charge of conspiracy in a civil action is merely the string whereby the plaintiff seeks to tie together those who, acting in concert, may be held responsible in damages for any overt act or acts. The person harmed by the conspiracy may bring suit as soon as the damage to him is inflicted; he obviously need not wait until the termination of the conspiracy which caused it. It is at the time of injury that the "right to relief by action" arises and the statute therefore begins to run at the moment such injury occurs. Momand v. Universal Film Exchanges, 1 Cir., 1948, 172 F.2d 37, 49, certiorari denied, 1949, 336 U.S. 967, 69 S.Ct. 939, 93 L.Ed. 1118; Park-In Theatres v. Paramount-Richards Theatres, D.C.Del.1950, 90 F.Supp. 727, 729, affirmed 3 Cir., 1950, 185 F.2d 407, certiorari denied, 1951, 341 U.S. 950, 71 S.Ct. 1017, 95 L. Ed. 1373; Williamson v. Columbia Gas & Electric Corp., 3 Cir., 1950, 186 F.2d 464, 469, certiorari denied, 1951, 341 U.S. 921, 71 S.Ct. 743, 95 L.Ed. 1355. The Momand case points out the important distinction between the rule applicable in civil and that applicable in criminal cases.

### a. The L. L. & B. Claim

■ The statute started running against the L. L. & B. claim in 1931, or at the latest, December 1932, when the jury found that the plaintiff should have become aware of the claim in the exercise of reasonable care. Higgins v. Crouse, 1895, 147 N.Y. 411, 416, 42 N.E. 6. Any cause of action arising out of the L. L. & B. transaction could not be kept alive by alleging that it was all part of a conspiracy which went on for many years and as a result of which Reinfeld secretly received certain benefits from the other defendants in 1940 and thereafter. No allegation of conspiracy can thus jump an eight or nine year gap to make a shambles of the statute of limitations and pervert its salutary purpose to set stale claims at rest. Were this not so any bargain which turned out advantageously to the purchaser might be challenged upon a charge of conspiracy made years afterward if any other parties to both sides of the transaction subsequently had further advantageous business dealings with each other. We hold that the plaintiff was barred from bringing suit on the L. L. & B. transaction long before he brought the action in 1948.

### b. The Browne-Vintners Old Claim

■ Nor is the claim regarding the sale of Rutkin's interest in Browne-Vintners Old and the transfer of the Cointreau, Piper Heidsieck and Remy Martin agencies one which Rutkin may prosecute under his 1948 complaint or his supplemental complaint filed in November 1951. If this was a wrong, it was a wrong suffered not by Rutkin but by a New York corporation, Browne-Vintners Co., Inc. Whether suit is brought by that corporation, or by a stockholder (assuming for

the moment that Rutkin was such an owner of a stock interest as to give him any legal standing to enforce such a claim) such suit is governed by § 48, subd. 8 of the New York Civil Practice Act which requires that suit be commenced within six years after the action accrues. Hastings v. H. M. Byllesby & Co., 1944, 293 N.Y. 404, 411–412, 57 N. E.2d 733, certiorari denied sub nom. Hastings v. Haystone Securities Corp., 1945, 324 U.S. 860, 65 S.Ct. 864, 89 L.Ed. 1417. The sale of Browne-Vintners, to which Rutkin consented in advance, took place on December 20, 1940. The fact that the plaintiff alleges fraud which was not discovered until a later time does not bring the claim within § 48, subd. 5, so that the statute is tolled until the discovery of such fraud. Zwerdling v. Bent, 1943, 291 N.Y. 654, 51 N.E.2d 933. The gravamen of the action is still a breach of duty by those in control of the corporation and the appropriate limitation period is that prescribed by subd. 8 of § 48. Hastings v. H. M. Byllesby & Co., supra, 293 N.Y. at pages 411–412, 57 N.E.2d 733; Gottfried v. Gottfried, 1st Dept. 1945, 269 App.Div. 413, 56 N.Y.S. 2d 50.

The claim with respect to Browne-Vintners Old arose on December 20, 1940 when Browne-Vintners Old was sold to Distillers-Seagrams for $7,500,000. The statute runs from that date and not from the date or dates when Reinfeld, allegedly as a part of the conspiracy, received the Cointreau, Piper Heidsieck and Remy Martin agencies through his controlled company, Renfield Importers, Ltd. or when he received any other alleged secret emolument.

The evidence regarding the transfer of the three liquor agencies was relevant on the theory that if those agencies were later transferred directly or indirectly by the Bronfmans to a Reinfeld company for no consideration that fact could be considered by the jury on the question of whether Reinfeld had caused Browne-Vintners Old to be transferred to the Bronfmans for an inadequate consideration because of a secret side agreement that he would later be given these three agencies, or any of them. Thus what happened to the agencies after 1940 merely related to and bore on the purpose and nature of the 1940 transaction. It was the 1940 transaction which damaged the corporation and Rutkin to the extent that Rutkin had any interest in that corporation, not the later actions of the Bronfmans or anyone acting at their behest in causing the transfer of the agencies to Reinfeld's company or in facilitating their acquisition.

■ In any event the claim regarding Browne-Vintners Old was not asserted until the supplemental complaint was filed on November 13, 1951. The claim cannot be dated back to July 1, 1948 when the complaint was filed. Harriss v. Tams, 1932, 258 N.Y. 229, 240–245, 179 N.E. 476. Thus under the applicable New York law the claims arising from the sale of Browne-Vintners would have had to arise from acts which took place not later than November 13, 1945 in order to survive the bar of the statute. However, on any possible theory, including the one which we reject, the last act of claimed damage took place in August 1945, when the Piper Heidsieck agency was acquired by Renfield Importers, Ltd. Thus the Browne-Vintners claim was barred by the New York statute.

We now turn to the assertion of the defendants that both the L. L. & B. and the Browne-Vintners Old claims are unenforceable for illegality.

*Unenforceability because of illegality*

*a. The L. L. & B. Transaction, 1931*

In the course of the plaintiff's case there was considerable testimony regarding his relationships with Reinfeld and various other partners in a bootlegging syndicate which operated from about 1927 until the repeal of the Prohibition Amendment on December 7, 1933, and after repeal in Browne-Vintners Old. Much of this was repetitious of what was before the Supreme Court in Rutkin v. United States, supra, wherein Mr. Justice Burton summarized the evidence at pages 132 to 134 of 343 U.S., 72 S.Ct. 571,

96 L.Ed. 833. Indeed considerable of the evidence given before the New Jersey jury which convicted Rutkin was read to the petit jury herein or was used to refresh and cross examine witnesses including Rutkin himself.

As bearing on the illegality of the L. L. & B. transaction the plaintiff's case established the following:

Sometime in 1927 Rutkin, who had been in the liquor business during prohibition, became a 6% partner of a large bootlegging syndicate of which Reinfeld was the general manager with headquarters in Newark, New Jersey. Rutkin testified "We purchased whiskey in Montreal, the boats picked it up in St. Pierre-Miquelon, and we brought it in and distributed it." The partnership picked it up in its own boats registered in the name of a Nova Scotia company; it owned trucks, boats and barges. The liquor was unloaded at different places in New Jersey and New York and sold in the United States. In bad weather it was unloaded offshore into smaller boats and brought to the dock. Shipments ran from 5,000 to 30,000 cases. For the whiskey that was imported millions of dollars were wired to Canada. About 1928 the Rutkin-Reinfeld group was joined by another large bootlegging group "in order not to conflict with each other and have the market not go too haywire and to stabilize the market."

Early in 1931 one Marco Leon of Montreal talked to Rutkin and Reinfeld in Montreal suggesting that they acquire the L. L. & B. distillery located at Chatham in Ontario, then in financial difficulties although almost ready to operate. Leon told them "in very short order it could be straightened out to operate." Rutkin said to Reinfeld "Joe, this is just what we want. We can operate this plant. The whiskey business does not employ many people.—distilling whiskey doesn't—and whatever whiskey we don't send to St. Pierre ourselves, we have friends who will buy from us, and this deal is very, very good. We must not let it get away." Reinfeld agreed with this. At that time the price of whis-

key was kept up by a pool of the five principal Canadian distillers, the Bronfmans being one of the five. The evidence showed that whiskey could be produced in about six months; thus the Rutkin-Reinfeld group would have had a sure and cheaper source of supply—by way of St. Pierre.

Rutkin thought in terms of selling the whiskey within six months to a year. Thus he testified:

"Q. About how long would it take to turn out whiskey for your, shall I say, partnership trade in 1931? A. For the trade?

"Q. Yes. A. I can't answer that unless you let me quote Joe Reinfeld.

"Q. No. I want your testimony as to what you think about it. A. What I should think about it? Six months.

"Q. Six months. Because you were only getting whiskey sometimes that was only six months to a year old, is that right? A. Correct."

Upon his return to New Jersey Reinfeld arranged to have four or five experienced distilling men go up to Canada to run the plant. Rutkin and Reinfeld themselves visited the plant. Reinfeld promptly sent his lawyer, David Popik, to Canada to handle the necessary financial transactions. In acquiring the stock and the mortgages Popik used either the names of dummies or his own name rather than the names of Rutkin and Reinfeld or any of their associates although the moneys which he advanced were sent to him by the treasurer of the bootlegging partnership, Kanengeiser. Thus $29,660.75 for the first mortgage was money of the partnership given to Popik by Kanengeiser.

A few weeks after their Montreal visit Rutkin asked Reinfeld: "Joe, how is the plant? What type of whiskey comes out? Is it light, heavy, or what?" Whereupon Reinfeld told Rutkin that he had agreed to turn the distillery over to Bronfman for what it had cost them.

The trial court in ruling against the defendants' contentions on this point stated that in view of the repeal of the Eighteenth Amendment in 1933 "the triers of the fact may have found that acquisition of the Canadian distillery was with a view to sell its products in the United States after repeal." This argument loses some of its force when we note that the joint resolution in Congress which ultimately became the 21st Amendment was not introduced until February 20, 1933. A prior resolution was introduced and defeated on December 5, 1932. Although there was agitation for the repeal of the 18th Amendment almost from the time it was adopted, there is no reason to believe that repeal was sufficiently predictable early in 1931 to warrant assuming its occurrence in embarking on a business venture.

At the very least on this record this question should have been left to the jury as were the questions regarding limitations. Not only did the trial judge not leave this question to the jury specially as had been requested by counsel, but there was no instruction whatsoever on the question of illegality despite appropriate requests to charge.

The Reinfeld defendants' amended request number 8 read: "I charge you that if you find the so-called 'High Seas' partnership was in fact engaged in bringing intoxicating liquors into the United States for sale in violation of the National Prohibition Act [41 Stat. 305]; and if you further find that the L. L. & B. distillery and company were to be acquired, if at all, for [the use of] that partnership, then you may not award any damages to plaintiff in respect of the L. L. & B. transaction." Request number 19 for the Bronfman defendants was to the same general effect. Both requests were denied.

■ In any event the evidence here is so clear and convincing that in 1931 Rutkin and Reinfeld intended the L. L. & B. distillery operation to be a part of their business of illegally importing liquor into the United States that the trial judge should have dismissed that part of the case having to do with the L. L. & B. transaction. Even Rutkin never testified that the partnership did not intend to import L. L. & B. whiskey until after repeal; on the contrary all his testimony makes it clear that they were interested in a quick and cheap source of supply in 1931. While repeal was then a remote possibility, the higher prices resulting from the Canadian pool operation was a present competitive fact. While the trial judge argued in his opinion that minimum standards of potability for the whiskey would support a finding (which was never made) that what was planned in 1931 was not meant to take effect until after repeal in 1933, this is pure speculation and is certainly contrary to the experience of a large part of the long suffering American liquor consuming public at the time. There is no evidence that the Rutkin-Reinfeld bootlegging operation cared anything about the potability of the product which they were selling illegally on an enormous scale and at large profits.

■ The trial judge further argued that since the L. L. & B. transaction took place in Canada the prohibition laws of the United States did not render it illegal. But it now seems well settled that if a contract is entered into with a view of violating the laws of another country it is unenforceable even though it does not otherwise contravene the law of the place where it is made or of the forum. 6 Williston on Contracts, § 1749 (rev. ed. 1938); Restatement of Contracts, § 592; Graves v. Johnson, 1892, 156 Mass. 211, 30 N.E. 818, 15 L.R.A. 834, Holmes, J. This appears to be the law of Canada as well. Walkerville Brewing Co. v. Mayrand [1928], 4 Dom.L.R. 500, noted in 42 Harv.L.Rev. 436. (This case was reversed on appeal [1929], 2 Dom.L.R. 945, but the reversal was on the ground that the lower court should not have taken judicial notice of the law of the United States.) Rutkin was clearly aware of the illegal purpose of the L. L. & B. transaction and was in fact, a member of a conspiracy bent on effecting that purpose.

He is therefore in no position to assert rights based upon the L. L. & B. contract. Moreover, any rights which Rutkin may have in the L. L. & B. transaction are derived through a bootlegging partnership which was itself illegal. This partnership carried on its liquor business in the United States, and was therefore clearly governed by the prohibition laws of the United States. A member of such an illegal partnership is not entitled to enforcement of any right depending on the partnership agreement. McMullen v. Hoffman, 1899, 174 U.S. 639, 19 S.Ct. 839, 43 L.Ed. 1117; Rosenblum v. Frankel, 1st Dept. 1951, 279 App.Div. 66, 108 N.Y.S.2d 6; Parise v. Pepe, 2nd Dept. 1951, 270 App.Div. 769, 59 N.Y.S.2d 497; O'Connor v. O'Connor, 2nd Dept. 1941, 263 App.Div. 820, 31 N.Y.S.2d 372. McMullen v. Hoffman is cited with approval in Bruces Juices v. American Can Co., 1946, 330 U.S. 743, 756 note, 67 S.Ct. 1015, 91 L.Ed. 1219.

 The L. L. & B. transaction having been spawned in illegality, the later repeal of the Eighteenth Amendment in December 1933 did not open the doors of the courts to the plaintiff. Fitzsimons v. Eagle Brewing Co., 3 Cir., 1939, 107 F.2d 712, 126 A.L.R. 681. The law of New York now seems to be clearly settled that without some plain indication of a contrary legislative intent the repeal of a statute does not validate contracts previously illegal under it. Toll v. Friedman, 1st Dept. 1947, 272 App.Div. 587, 74 N.Y.S.2d 176; Dunmar Robes Ltd. v. Buenaventura, 1st Dept. 1952, 279 App. Div. 286, 109 N.Y.S.2d 699; Government of the French Republic v. Cabot, Sup.Ct. N.Y.County 1947, 190 Misc. 517, 76 N.Y. 2d 290.

### b. Browne-Vintners Old

Two or three months before repeal in December 1933 Rutkin and Reinfeld and their bootlegging partners discussed conducting a liquor business after repeal. According to Rutkin, "Joe Reinfeld said 'we will form a company in New York City and a lot of us cannot go in and put money in under our own names * * *

through being in the liquor business during Prohibition.'" Reinfeld said he would send some of the partnership money to one Bowers in Canada for investment through Bowers in the new company. Maybe three or four hundred thousand dollars was thus sent to Canada. A New York corporation, Browne-Vintners Co., Inc. (Browne-Vintners Old) was formed and a druggist named Browne was put in as nominal president. Rutkin testified that subsequently Browne-Vintners Old obtained a New York State liquor license. Rutkin claimed he had an interest in the company from the beginning which interest did not appear on the books but was held for him by Reinfeld. Rutkin testified that the reason he was not carried as a stockholder was "because I was in the bootlegging business." Others of the old bootlegging partners also had interests in Browne-Vintners Old which were not disclosed in the license application filed November 16, 1933, among them Abner Zwillman, Joseph Stacher, Joseph and Harry Davis and Reinfeld. Although Reinfeld's interest was later disclosed in a 1940 application, Rutkin's interest was never disclosed to the New York authorities.

The questions in the New York State application for corporate liquor businesses were obviously designed to discover all persons having an interest in the business regardless of whether they were stockholders of record; this was pursuant to the provisions of the Alcoholic Beverage Control Law, Mc.K.Consol.Laws, c. 3–B, § 110. Thus question 13 required all applicants to "state the name and residence of each person interested, or to become interested, in the traffic of liquor for which the application is made, together with the nature of such interest," and question 14 asked for information regarding any associates or partners.

 Here Rutkin relied on his undisclosed interest, which was illegally concealed from the New York State authorities, to support his claim that he was defrauded when the Browne-Vintners Old assets were sold. Having failed to disclose his interest as the law requires, he

may not now assert that interest in a court of law. In the leading New York case of Flegenheimer v. Brogan, 1940, 284 N.Y. 268, 30 N.E.2d 591, 132 A.L.R. 613, the widow of Flegenheimer, better known as "Dutch Schultz," was debarred from invoking the aid of the court with respect to her husband's interest in a liquor corporation, which interest had not been disclosed in accordance with the provisions of the Alcoholic Beverage Control Act. The Court of Appeals in sustaining the defense of illegality wrote at pages 272 and 273 of 284 N.Y. at page 592 of 30 N.E.2d: "In effect, then, this action is one brought by an alleged secret owner to vindicate his assertion of beneficial title to property he had parted with in order to perpetrate a fraud upon the statute which regulates and controls traffic in alcoholic beverages. * * * The transactions of plaintiff's intestate were clearly destructive of the purpose of a statute which was enacted 'for the protection, health, welfare and safety of the people of the state.' Alcoholic Beverage Control Law, § 2. We think those transactions were so far against the public good as to disable the plaintiff from invoking the aid of the court in her endeavor to disengage herself (as administratrix) from the unlawfulness of the conduct of her intestate." O'Connor v. O'Connor, supra; Romano v. Bono, Sup. Ct.Kings Co., 1938, 168 Misc. 897, 6 N.Y. S.2d 204; Rosenblum v. Frankel, supra; and Parise v. Pepe, supra, are to the same effect.

The trial judge attempted to distinguish the Flegenheimer case on the ground that here Rutkin did not himself perpetrate the concealment. This view completely disregards Rutkin's sworn testimony that it was understood by him, by Reinfeld and by the other partners at the 1933 meeting that his interest, and other interests as well, would not be disclosed. Since he participated in the illegality, his claim is clearly unenforceable under the rule of the Flegenheimer case.

Thus as the acts which caused the alleged damages to the plaintiff all flowed from illegal transactions—the L. L. & B.

transaction and the plaintiff's interest in Browne-Vintners Old—the trial judge should have granted the defendants' motion to dismiss the case.

The defendants also urge additional errors: that there was no substantial evidence to establish the alleged conspiracy, that recovery on the Browne-Vintners Old claim is barred by an assignment, that recovery is completely barred by a general release of May 11, 1943, and, as to Reinfeld, that he was entitled to a credit of $250,000 which he had paid Rutkin for the general release. As the two grounds which we have considered each disposes of the case, it is unnecessary to deal with these other items of alleged error.

The judgment is reversed and the complaints are dismissed.