Lieutenant W. E. ("Sonny")
SIMPSON, Plaintiff,

v.

Gale WEEKS, Chief of Police, Little Rock, Arkansas; John C. Terry, Assistant Chief of Police, Little Rock, Arkansas; and Lieutenant Forrest H. Parkman, Officer, Little Rock Police Department, Defendants.

No. Lr-75-C-151.

United States District Court,
E. D. Arkansas, W. D.

Feb. 25, 1977.

As Amended Feb. 28, 1977.

John I. Purtle, City Atty., Little Rock, Ark., for plaintiff.

William R. Wilson, Jr., and Kaneaster Hodges, Jr., Newport, Ark., for defendants.

## MEMORANDUM OPINION

SHELL, District Judge.

This is a civil action brought by Walter E. ("Sonny") Simpson pursuant to 42 U.S.C. § 1983 seeking a declaratory judgment, injunctive relief and damages to redress the alleged deprivation, under color of state law, of plaintiff's rights secured to him by the laws and Constitution of the United States. Jurisdiction in this cause is predicated upon 28 U.S.C. § 1343(3), (4), and 28 U.S.C. §§ 2201 and 2202.

Plaintiff Simpson is a lieutenant with the Little Rock, Arkansas Police Department. Defendant Gale F. Weeks is Chief of Police of the Little Rock Police Department (here-

inafter L.R.P.D.), and defendant Forrest H. Parkman is a lieutenant with the L.R.P.D. Defendant John C. Terry retired from the position of Assistant Chief of Police, L.R. P.D., on January 14, 1977. At all times pertinent to this lawsuit plaintiff and defendants were serving in their official capacities as indicated above.

In his complaint plaintiff alleges that shortly before December 2, 1974 plaintiff and other officers of the Little Rock Police Department were served with subpoenas by the United States Marshal to appear as witnesses in the cause of *Phillips, et al. v. Gale Weeks, et al.,* LR–72–C–26, before the Honorable G. Thomas Eisele, United States District Judge for the Eastern District of Arkansas. The trial in the *Phillips* case commenced on December 2, 1974 and the evidentiary phase ended on February 17, 1975. Plaintiff alleges that during the pendency of the above-referenced case defendant Weeks developed an unfounded belief that Lt. Simpson, while under compulsion of subpoena, provided information relating to the merits of the *Phillips* case to an attorney for plaintiffs in that cause. Plaintiff denies ever having given information to the attorneys for plaintiffs in the *Phillips* case. Lt. Simpson further alleges that as a result of defendant Weeks' baseless notion, these defendants, individually and as members of a conspiracy, have harassed, intimidated, and punished plaintiff in an attempt to harm his career as a Little Rock police officer. The gravamen of plaintiff's claim is his assertion that he enjoys an unfettered right as a subpoenaed witness in a United States District Court proceeding to confer with attorneys for parties, and punishment inflicted upon him by these defendants on grounds of a suspected exercise of this right constitutes a violation of 42 U.S.C. § 1983.

Defendants specifically deny having harassed or punished the plaintiff, and further allege that as a Little Rock police officer plaintiff's right to confer with attorneys for parties during a United States Court proceeding is not absolute even though plaintiff may have been subpoenaed as a witness

for the purpose of those proceedings. An evidentiary hearing on these issues was commenced on Monday, February 14, 1977 and concluded on February 16, 1977. Oral arguments were heard on Thursday, February 17, 1977. Hereinafter follows the Court's findings of fact and conclusions of law.

FINDINGS OF FACT

Walter E. ("Sonny") Simpson is presently forty-one years old and a veteran officer of the Little Rock Police Department with nearly seventeen years of service. He was born in Searcy, Arkansas and raised in the neighboring community of Floyd. Lt. Simpson graduated from high school at Beebe, Arkansas in 1953 and joined the Little Rock Police Department on July 20, 1959, having worked since high school graduation as a wage-earner at an automotive parts business in Little Rock.

It is undisputed that plaintiff rose in the rank in the Little Rock Police Department at a meteoric rate until February 28, 1975. After more than six years of service as a motorcycle patrolman (interrupted by a call to emergency active duty in the United States Army in 1961), plaintiff was assigned to a sergeant's slot as Assistant Training Officer in January 1967. In this position plaintiff assisted in the hiring and training of police personnel and participated in the department's public speaker's bureau by speaking frequently at the public schools and other community functions. Lt. Gene Trist was his supervisor. In July 1967 Simpson was promoted to the rank of sergeant. Plaintiff was the youngest sergeant in the history of the department and no officer had made this grade in less time than plaintiff. In July 1971 Simpson was promoted to the rank of lieutenant and appointed to the newly-created position of Public Information Officer. The L.R.P.D. Office of Public Information was the first of its kind in this state. No other officer in the Little Rock Police Department with his length of service had risen to the rank of lieutenant faster than plaintiff. During this period plaintiff reported directly to Police Chief Gale Weeks.

In February 1973 Lt. Simpson was made officer in charge of the Vice and Narcotics Division of the department. At this assignment plaintiff reported directly to the Chief and had an average of fourteen policemen under his supervision. From January 1974 until June 1974 plaintiff was the lieutenant in charge of the evening shift in the Burglary and Auto Theft Division of the Investigation and Apprehension Section. At this post plaintiff had at least fifteen officers under his command and his immediate supervisor was Capt. W. D. Gibson. From June 1974 until January 1975, under the direction of Capt. Norman E. Mallet, and with the assistance of Chief Weeks and Sgt. Robert Pulley, plaintiff conducted the research necessary to secure federal funding to implement a pilot program deemed the Residential Area Foot Patrol of the Little Rock Police Department. When this program was activated on January 7, 1975, it was one of the first of its kind in the country and received nationwide publicity. Lt. Simpson was selected officer in charge of this prototype program and had twenty-seven men under his command. Plaintiff filled this post until February 28, 1975.

The Court credits plaintiff's testimony that at each juncture in his career prior to February 28, 1975 his new supervisor discussed in detail goals and job objectives for his new assignment. A composite exhibit averaging plaintiff's civil service job efficiency ratings [1] from April 1, 1972 to De-

1. Promotions in rank in the L.R.P.D. are governed by the procedures of the Little Rock Civil Service Commission. The Commission's authority is derived from the Board of Directors of the City of Little Rock, the legislative body of the municipality. Prior to appealing to the Commission for certification for promotion an applicant must serve a fixed time in rank and receive a passing score on a written examina- tion related to the position sought. Five criteria are taken into consideration by the Commission in ranking the officers it certifies. Each criterium is assigned a percentage value. A score of one hundred percent is perfect. In police department matters the Commission assigns a forty percent value to an applicant's score on the written exam and a twenty percent value on his or her seniority in rank. Job

cember 31, 1974 bespeaks plaintiff's achievements toward reaching these goals. Graded quarterly during these years by his immediate supervisors on twenty criteria ranging from "initiative" to "quality of work," the highest possible grade in each category being a rating of ten, plaintiff earned a 94.76 percent average.

Plaintiff's career took a turn for the worse soon after he assumed command of the Residential Area Foot Patrol division. On February 28, 1975 Lt. Simpson was reassigned by order of Chief Weeks to work the so-called "graveyard shift" from eleven o'clock in the evening to seven o'clock in the morning as night jailer in the police detention facility. In addition, plaintiff's heretofore meritorious record for job efficiency was blemished severely. During the first quarter of 1975 plaintiff received a 61.5 percent overall rating for job efficiency. He was graded "zero" in the categories of "loyalty" and "ability to size up situations." It is his assignment to the position of night jailer, together with several incidents of alleged harassment and allegedly unparalleled low job performance ratings he received after January 1, 1975, which Simpson contends constituted impermissible punishment inflicted upon him by these defendants.

Lieutenant Simpson's staff duties as night turnkey in the jail were in stark contrast to the responsibilities he had assumed on previous assignments.[2] As officer in charge of the foot patrol program Lt. Simpson had, on the average, twenty-seven men under his command. At the jail, however, despite the fact that plaintiff held the highest rank among the six policemen assigned to that section, he had only one man under his supervision, Sgt. Don Wood. Sergeant Wood's assignments under plaintiff's supervision were only part-time at that. Two nights out of every week plaintiff maintained the watch over the jail by himself.

It was further established from the testimony that upon reporting to the jail plaintiff was not recognized in the chain of command even though he was purportedly the officer in charge. Initially plaintiff was relegated to receiving his daily orders concerning the operation of the jail from his subordinate, Sgt. Wood, despite the fact that plaintiff's immediate supervisor was Lt. Claude Campbell. This practice soon ceased when Lt. Simpson complained to Sgt. Wood and Wood agreed, stating that the practice also made him uneasy.

On March 14, 1975 Lt. Campbell telephoned plaintiff at home to convey an order from Chief Weeks and Asst. Chief Terry that plaintiff was to stay in the basement at the jail and not come upstairs during his tour of duty. The Court credits plaintiff's testimony that he infrequently came upstairs to the main office on the first floor except at the conclusion of his shift.

Plaintiff remained at his assignment at the jail until approximately one month prior to the trial of this case. The conditions of his assignment remained substantially the same with the exception of his transfer to the "swing shift" on October 1, 1975. The "swing shift" works between the hours of four o'clock in the afternoon to twelve o'clock midnight.

Plaintiff's legal contentions in this case are that these defendants, acting individually and in concert, under color of state law, punished him in violation of rights secured

performance ratings assigned by an applicant's immediate supervisor on a quarterly basis are computed semi-annually and submitted to the Commission to cover a one-year period prior to the date of application. These ratings are afforded a ten percent value. The Chief of Police rates each applicant and this rating is assigned a value of ten percent. The remaining twenty percent is an average of the ratings of at least three of the five members constituting the Commission upon consideration of all of the above-mentioned ratings and the results of an interview conducted by the Commission. When promoting personnel in the department the Chief of Police is bound to promote the certified applicants in the order in which the Commission has ranked them.

2. The undisputed testimony was that the police jail, located in the basement of the police building, held, on the average, sixty inmates a night. Most, if not all, of the inmates were held there for very short terms, usually only a few days.

to him by the laws and Constitution of the United States. The legal contentions will be dealt with in greater detail below. Plaintiff's key factual contentions are his assertions that these defendants punished him with an avenging desire to damage his career as a result of an unfounded belief developed by Chief Weeks that plaintiff leaked police department information relating to the merits of the *Phillips* case to an attorney for plaintiffs therein during the course of trial of that case.

This is a civil case and plaintiff, of course, bears the burden of proving his contentions by a preponderance of the evidence. It is the opinion of this Court that the evidence adduced at trial clearly and convincingly sustains plaintiff's key factual contentions. There is no doubt in the Court's mind that defendants Weeks, Terry, and Parkman, acting with retributive intent by means of a conspiracy, damaged plaintiff's career as a police officer due to their mistaken belief that plaintiff was snitching to an attorney for plaintiffs in the *Phillips* trial.

Although it is probably unnecessary to the disposition of this case to determine whether Lt. Simpson spoke with the attorneys for the plaintiffs in the *Phillips* case while under subpoena, the Court will begin its findings with the conclusion that at no time has Lt. Simpson, while under subpoena or otherwise, talked with any of the attorneys associated with the plaintiffs in *Phillips* concerning any matter related to that case. The Court credits the testimony to this effect from the plaintiff and all attorneys even remotely associated with the plaintiffs in the *Phillips* trial.

Mindful that it is the plaintiff who must bear the burden of proof, the Court nevertheless feels that it will be helpful by way of background at this point to discuss one of defendants' factual theories relative to Lt. Simpson's transfer to the jail. The defendants have argued that plaintiff could not have been assigned to the jail due to a baseless notion developed by Weeks that Simpson was a snitch because Weeks did not receive information to that effect until March 4, 1975, five days after the transfer.

It was shocking to the conscience of this Court to learn *how* Chief Weeks received information that plaintiff was talking to attorneys for plaintiffs in the *Phillips* trial, putting aside for the moment the question of whether the Chief received this information on or before March 4, 1975. The evidence clearly established that throughout the trial phase of the *Phillips* case Sgt. Loyd W. Maughn of the Little Rock Police Department paid an informant who was employed by the office of the attorneys for plaintiffs in the *Phillips* case for information relating to those attorneys' trial preparations. The informant was Willie Scott. Scott was employed by the law firm of Walker, Kaplan and Mays, P. A., as a private detective and assisted Mr. Richard Mays in the preparation of plaintiffs' case in the *Phillips* trial. Scott had intimate knowledge of Mr. Mays' work product in that case. During the *Phillips* trial Sgt. Maughn was assigned to the task of attending to Chief Weeks' needs in preparing for each day of trial. Maughn reported to Chief Weeks daily prior to trial to discuss the case and was present with the Chief at almost every session of the evidentiary phase. Information received through Scott was reported to the Chief during the course of the trial. Sgt. Maughn testified, however, that it was not until March 3, 1975, more than two weeks after the *Phillips* trial concluded, that Scott produced any information with regard to Simpson. Sgt. Maughn testified that on March 3, 1975 Scott viewed a photograph of Simpson and stated that the man featured in the photograph resembled a policeman Scott had seen in Richard Mays' office during the early part of the case.

Mr. Scott contradicted Sgt. Maughn's testimony in certain respects. Scott testified that no later than the second week of the *Phillips* trial, he picked out Simpson's photo and told Maughn that the man in the photo resembled an officer he had seen in the first floor restaurant of the Pyramid Building. Richard Mays' office is located on the sixth floor of the Pyramid Building.

The methods utilized by Chief Weeks and Sgt. Maughn in obtaining information concerning matters relating to the *Phillips* trial may be only indirectly relevant to the case *sub judice*. However, this Court in good conscience cannot let their revelations go unnoticed. Such deceitful tactics are repugnant to the fair administration of justice and exhibit a low estimation on the part of Chief Weeks and Sgt. Maughn of the integrity of the judicial process.

Returning to the discussion of the defendants' factual theories, all three defendants testified on direct examination that they had no information prior to March 4, 1975 that Lt. Simpson had been identified by Willie Scott as a snitch. In support of their assertions defendants relief heavily on the fact that a memorandum dated March 3, 1975 from Sgt. Maughn to Chief Weeks was the source of this information. The Court discredits the defendants' testimony in this regard and further finds that Sgt. Maughn's memorandum relating to Simpson's identification (admitted into evidence as plaintiff's exhibit No. 10) is a false document insofar as it bears the date March 3, 1975 and asserts that Simpson was identified by Scott on March 3, 1975.

In sworn depositions taken at the insistence of the plaintiff on June 27 and 28, 1975, Sgt. Maughn and defendant Weeks admitted that they had received information that Simpson was one of the snitches talking to Richard Mays in the midst of the *Phillips* trial. In his June 27, 1975 deposition, Sgt. Maughn stated that he relayed this information to the Chief during the progress of that trial. In his September 7, 1976 deposition, Sgt. Maughn stated that Scott identified Simpson as a snitch "[d]uring the first three days of the trial; the first part of the trial." Defendant Parkman stated in his sworn deposition on September 20, 1976 that Maughn had told him during the *Phillips* trial that Simpson had been "positively identified as the person that [sic] was carrying the information to Mr. Mays." When confronted with these sworn statements during cross examination in the instant case, these witnesses pleaded confusion or inaccuracy in the depositions.

These excuses carry little weight with this Court, especially when it is considered that some of these admissions were made in June 1975, little more than four months after the trial was concluded in the *Phillips* case.

Turning now to specific findings in support of plaintiff's key factual contentions, the Court will relate certain significant events, the occurrence of which have lead the Court to conclude that plaintiff has satisfied his burden of proof in establishing his contentions. Careful scrutiny of the evidence was required to determine that it was in fact the defendants' intent to punish Simpson because of their mistaken belief that he had snitched to Richard Mays. The Court views a finding of such intent necessary in this dispute if this case is to fall within the purview of the Constitution. It must be remembered that intent is a state of mind, ethereal in nature, and can rarely, if ever, be established by direct proof. The circumstantial evidence detailed below satisfies this Court that these defendants entertained sufficient intent when punishing the plaintiff to sustain plaintiff's claim.

On February 4, 1975, before the conclusion of the *Phillips* trial, Lt. Parkman and Lt. Simpson attended a staff meeting conducted by Chief Weeks. Two staff meetings were conducted that day, the first of which was limited to high ranking officers. Lt. Simpson attended both meetings. At these meetings Chief Weeks announced to his staff that certain "high ranking officers had been identified" as police personnel who had talked with Richard Mays during the progress of the trial. The Chief went on to opprobriously describe these officers as "tumblebugs" and declare that these officers would be "dealt with." Lt. Parkman's version of what was said during at least one of these meetings was read into evidence from his deposition taken September 20, 1976. Parkman's version coincides with plaintiff's version.

On an undetermined day during the week of February 23, patrolman Monty Vickers met with Chief Weeks at Vickers' request.

Vickers had recently been transferred from his position as detective in the Vice and Narcotics Division and wanted to discuss with the Chief rumors he had heard that the Chief believed Vickers was one of the snitches talking to Richard Mays. Capt. Malley was present at the meeting. In essence, Vickers testified that the Chief told him he had no cause for worry, the snitch had been identified as Simpson. The Chief stated that it was understandable the two officers would be confused because they were similar in appearance. When talking about Simpson, Vickers stated that Chief Weeks looked "upset and perturbed." Vickers further testified that the Chief said, "I can assure you that this lieutenant is gone, his career will go no further." At the conclusion of the meeting Capt. Hale was called in and told by the Chief that Vickers was "clean" and the men in the detective section should be so advised. After the meeting, Vickers testified that he immediately attempted to contact Simpson, but that Simpson's wife informed him that Simpson was at Quantico, Virginia. The Court credits Patrolman Vickers' testimony.

In light of plaintiff's testimony concerning procedures followed on prior transfers, the Court agrees with plaintiff that his transfer on February 28, 1975 was not handled in the usual fashion. From February 23 to February 28 plaintiff attended a conference for law enforcement officers at the Federal Bureau of Investigation Training Academy in Quantico, Virginia. When Simpson disembarked from the airplane upon his arrival in Little Rock on February 28, he was met by a uniformed officer of the L.R.P.D. who had been instructed to advise plaintiff to report immediately to the office of the Chief. Simpson proceeded to take his wife home from the airport before reporting to headquarters. He first heard that he was to be transferred to the jail from his wife, who told him that during his absence she had been so informed. When plaintiff reported to the Chief's office he was met outside Asst. Chief Terry's office by Capt. Norman E. Mallet, officer in charge of the patrol division, and Lt. Campbell. Once inside Asst. Chief Terry's office,

defendant Terry advised plaintiff that he was to be transferred to the jail. The Court credits plaintiff's testimony that this meeting was short and to the point. No mention was made that the jail needs improvement in light of allegations made during the *Phillips* trial. It is clear to the Court that plaintiff was not advised of job objectives and goals as was the case in the past at the time of his transfers.

On March 5, 1975, Lt. Simpson was telephoned at home by Asst. Chief Terry and told to report to the Chief's office. When Simpson arrived at the Chief's office defendant Terry was present with Chief Weeks. During this meeting Chief Weeks told plaintiff that he had been "positively identified" as the snitch. Plaintiff denied the assertion in no uncertain terms. Chief Weeks told Simpson that he was on further notice that the matter would be investigated.

Mr. Robert Sallee, a newspaper reporter for the *Arkansas Democrat*, testified that on March 5, 1975 he received a call from Asst. Chief Terry and was asked to come to the Chief's office. Attending the meeting at the Chief's office that day were Sallee, Terry, Weeks and Mr. Robert Douglas, managing editor of the *Arkansas Gazette*. Sallee testified that during the meeting the Chief stated that Simpson and another officer had been identified going in and out of Richard Mays' office during the *Phillips* trial. Sallee stated that the topic of Simpson's snitching was a substantial part of what was said at the meeting.

Patrolman Richard Fulks testified that in "mid-1975" he had a meeting with Chief Weeks at his own request to complain to the Chief about an incident which Fulks felt clearly showed that Charles Crawford, a member of the Civil Service Commission, was prejudiced against him. During this meeting Chief Weeks told Patrolman Fulks that although he knew Fulks and Simpson were friends, it was Simpson who had been identified as the snitch. Weeks went on to say that the reason Simpson had been transferred was so that Simpson would have "less contact with his fellow officers."

Sgt. Charles M. Goodwin testified that at a meeting "sometime in March 1975" with defendants Parkman and Terry present, Parkman stated that although it was first thought that Vickers was the snitch it was now known that Simpson was "the red-headed son-of-a-bitch who has been giving information to Richard Mays."

On May 14, 1975 Simpson was telephoned at home by Lt. Campbell and told to come to headquarters immediately. When plaintiff arrived Capt. Mallet and Asst. Chief Terry escorted Simpson into a vacant office. Defendant Terry proceeded to activate a tape recorder and reported the time, date, and who was present on the tape. Terry proceeded to interrogate plaintiff from a list of prepared questions. Plaintiff refused to answer the questions without an assurance on Terry's part that he could obtain a duplicate of the tape. When Terry refused this request Simpson requested the opportunity to confer with legal counsel. Terry denied the request for counsel on grounds that it was not a criminal investigation. When plaintiff requested to know the reason for the interrogation, Terry refused to give any. Terry would only say that Chief Weeks had ordered him to ask the questions. Terry stated that Simpson's request for legal counsel required an administrative decision that he was not empowered to make. Terry got up to leave the room and Simpson asked him if he could use the telephone either there or down the hall. Terry instructed plaintiff not to use the phone or to leave the room. Terry returned an hour and forty minutes later and played several tapes on the recorder. The tapes were recorded conversations between Larry Case, a private citizen, and plaintiff. Their subject was not revealed. When Terry asked what plaintiff thought of them, plaintiff said "play them on the intercom for all I care, they are not damaging to me."

The testimony further revealed that plaintiff's low civil service efficiency ratings for the first quarter of 1975 were the result of a meeting between defendant Terry, Capt. Mallet and Lt. Campbell on or about April 10, 1975. Job efficiency ratings were, as a rule, made by an employee's immediate supervisor. Capt. Mallet was plaintiff's immediate supervisor during plaintiff's service as the lieutenant-in-charge of the Residential Area Foot Patrol. Lt. Campbell was plaintiff's immediate supervisor in the jail. Although Asst. Chief Terry did not supervise plaintiff at anytime during the first quarter of 1975, the testimony clearly revealed that it was Terry who actually assigned the low grades to Simpson. Lt. Campbell merely wrote them down according to Terry's instructions. Chief Weeks, himself, testified that as a veteran of many years of service at the L.R.P.D. he has never known of any officer other than Simpson who has received zero ratings.

During the second and third quarters of 1975 Lt. Simpson was rated by Lt. Campbell and received civil service ratings of 78.5 and 88.5 respectively. On October 1, 1975 the detention center was made a division of the department and Lt. Simpson's immediate supervisor became Chief Weeks. Chief Weeks rated plaintiff as follows: January 1, 1976—87.5; April 1, 1976—85.5; July 1, 1976—94.5; and October 1, 1976—94.5.

The Court will once again turn to consideration of several of defendants' contentions in the case.

Defendants have argued that evidence admitted at the trial concerning an alleged purchase of illegal narcotics by undercover police officers from Charles Crawford, a member of the Civil Service Commission, which was never reported to prosecuting authorities, was a collateral matter and had no bearing on this lawsuit. It is true that there was no direct evidence in this case implicating Commissioner Crawford in a plan on the part of these defendants to damage plaintiff's career. However, three police officers—Donald Bullerwell, Tom Johnston, and Richard Fulks—testified that they participated in the buy from Crawford in March of 1974 and in their opinion the case was prosecutable. In addition, the testimony revealed that a tape recording of the transaction, made from a body trans-

mitter worn by an informant who allegedly made the buy, was, on defendant Parkman's request, placed in Parkman's safe immediately following the event. Parkman testified that the tape was of no prosecutive value and he has since misplaced it. Without more on this point this Court would have to agree with defendants that this evidence is too remote to have a bearing on this case. However, Officer Bullerwell testified further that shortly after June 16, 1976 (the date plaintiff subpoenaed Commissioner Charles Crawford for deposition), Parkman came to Bullerwell and stated words to the effect that "Simpson is on to the Crawford issue." Bullerwell went on to say that Parkman requested him to falsify a memorandum for the Crawford file opining that the Crawford case was not prosecutable and to backdate the memorandum prior to May 15, 1975, the date plaintiff filed this lawsuit. Bullerwell prepared the memorandum and backdated it to May 13, 1975. The Court finds this document to be false insofar as it purports to express Bullerwell's true opinion and bears the date May 13, 1975. This evidence has been considered.

Another factual theory posited by the defendants was that Chief Weeks transferred plaintiff to the jail because he thought Simpson was the "best player" on the force at that time. The evidence in this case simply does not support this assertion. Ample evidence has been detailed above indicating Chief Weeks' actual intent in transferring Simpson. Yet, the Chief testified on direct examination that Simpson's transfer to the jail was a result of allegations against the department in the *Phillips* trial of gross mismanagement in the detention center. The Chief went on to say that he was very pleased with the job Lt. Simpson had done during his stint at the jail. In view of plaintiff's unusually low civil service ratings during the period, it is nothing less than preposterous to believe that he was thought of as the "best player" on the force at that time. His ratings for the first six months of 1975 indicated that it was the view of his supervisors (and others who helped mark the reports) that Simpson's talents as a police officer left something to be desired. Furthermore, the evidence indicated that it was well after this lawsuit was filed and long after Simpson's transfer to the position of night turnkey that the Chief appealed to the city for one additional sergeant's slot to assist in the management of the jail.

Defendants' theory that plaintiff was transferred to the jail because Weeks believed plaintiff was a participant in an insurrection plot to unseat the Chief can be dealt with in very short order. The Court finds that there was no substantive evidence offered in this case to support such an assertion.

Based upon a review of all of the evidence, the Court finds that defendant Weeks was informed of the erroneous report that Simpson was talking to Richard Mays on or before February 4, 1976. The Court concludes that Lt. Parkman was so informed prior to the conclusion of the *Phillips* trial and that defendant Terry was so informed prior to February 28, 1975. In view of defendant Weeks' testimony that he and Terry discussed plaintiff's transfer, the manner in which defendant Terry carried out the order of transfer and other details of circumstantial evidence, the Court finds that a conspiracy to damage plaintiff's career, as alleged, was willfully and knowingly formed by defendants Terry and Weeks on or before February 27, 1975. The Court finds that this conspiracy, although continuing, was complete when defendant Terry committed the overt act of personally ordering plaintiff to work in the jail. The Court further finds that defendant Parkman willfully became a member of the conspiracy as alleged on or before June 20, 1976, which the Court finds as an approximate date Parkman committed a subsequent overt act of requesting Officer Bullerwell to falsify his memorandum on the Charles Crawford matter.

## CONCLUSIONS OF LAW

Section 1983 of Title 42, United States Code, provides in pertinent part that:

"Every person who, under color of any statute, ordinance, regulation, custom or usage of any state ... subjects any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

This statute comprises one of the so-called Civil Rights Acts enacted by the Congress under the Fourteenth Amendment to the United States Constitution. It is by means of the Fourteenth Amendment that certain rights of the federal Constitution are guaranteed to the states, specifically in this instance, the right of free speech and association found in the First Amendment. *Schneider v. State*, 308 U.S. 147, 160, 60 S.Ct. 146, 150, 84 L.Ed. 155.

The defendants' view of the law applicable to this case challenges this Court's jurisdiction to decide this dispute pursuant to 42 U.S.C. § 1983. Defendants' contentions, in this respect, have been dealt with for the most part in this Court's order entered on September 17, 1975 by the Honorable Warren K. Urbom, United States District Judge sitting by designation, overruling defendants' motion to dismiss. These issues will not be belabored here.

In essence, defendants contend that because plaintiff is a police officer he is lawfully bound by a police department regulation which would prohibit his talking, while under subpoena or otherwise, without authorization of the Chief, to an attorney or private person concerning police department matters. The defendants contend that the right of the state, as an employer, to regulate a policeman's free speech is paramount to plaintiff's right to speak on matters of public concern relating to his employment. Without a federally protected right, defendants claim that plaintiff cannot maintain this action under Section 1983.

■ It has been held that "policemen like teachers and lawyers are not relegated to a watered-down version of constitutional rights." *Garrity v. New Jersey*, 385 U.S. 493, 500, 87 S.Ct. 616, 620, 17 L.Ed.2d 562; and "they, like other employees, enjoy the protection of the First Amendment." *Muller v. Conlisk*, 429 F.2d 901 (7th Cir.). Courts have concluded that "the problem in any case is to arrive at a balance between the interests of the [public employee] as a citizen in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of public services it performs through its employees." *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811. Without hesitation, the Court concludes that interests of the plaintiff as a subpoenaed witness in a United States District Court proceeding in commenting to an attorney associated with that case concerning any matters related to that case override the interests of the police department in regulating his speech. With regard to plaintiff's cause of action, it matters not whether the conversation in fact took place. Judge Urbom has already ruled that this fact need not be determined "If the defendants, acting under color of state law, were and are solely motivated by a desire (1) to inhibit any such future conversations and (2) to punish the plaintiff for a past suspected exercise of his free speech rights."

■ It is well established that the doctrine of civil conspiracy extends liability for a deprivation of civil rights under 42 U.S.C. § 1983. *Cohen v. Norris*, 300 F.2d 24, 27 (9th Cir. 1962); *Hoffman v. Halden*, 268 F.2d 280 (9th Cir.). Civil conspiracy has been defined as "... concerted action or a sort of civil partnership in the commission of an injury whereby one may act for his partner and be bound." *Hoffman, supra*, at 293. Civil conspiracy is "... the string whereby the plaintiff seeks to tie together those who acting in concert may be held responsible for any overt act or acts." *Rutkin v. Reinfeld*, 229 F.2d 248 (2d Cir. 1956).

■ The essential elements of a conspiracy which plaintiff must establish by a preponderance of the evidence in order to prove his claim are: 1) that a conspiracy

existed as that term is defined above; 2) that any one or more of the defendants pursuant to the conspiracy, knowingly harassed, intimidated or punished plaintiff as alleged; 3) that any one or more of the defendants acted under color of state law; 4) that the act or acts of the defendants in joining the conspiracy or in pursuance of the conspiracy were committed with the intent to punish plaintiff for the suspect speech as alleged; and 5) that the defendants' acts or conduct were the proximate cause of injury and consequent damage to the plaintiff.

■ It is the opinion of the Court that the facts as determined above clearly support the conclusion that plaintiff has sustained his burden of proof on each of these elements against all defendants. It is undisputed that these defendants were acting under color of state law at all times pertinent to this action. The evidence amply supports the conclusion that these defendants knowingly joined a conspiracy and acted in pursuance thereof with the intent to punish Sonny Simpson for a suspected exercise of speech. That plaintiff was punished is clear upon review of the evidence under these circumstances relating to the conditions under which he worked in the jail. The evidence further established that plaintiff's career service record was blemished by low job efficiency ratings as a result of this conspiracy. Furthermore, it is obvious upon these facts that defendants, acting pursuant to the conspiracy, intended to intimidate plaintiff from the exercise of his rights in the future.

RELIEF SOUGHT

In his complaint plaintiff seeks a declaratory judgment, injunctive relief and damages, both actual and punitive, as well as reasonable attorneys' fees.

In his prayer for declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, plaintiff requests that this Court enter judgment declaring:

"(a) That the transfer of plaintiff to the jail, and the low quarterly marks were a violation of his legal and constitutional rights;

"(b) That the assignment of plaintiff to the jail, without prior notice, and the low quarterly marks without affording him [certain elements of procedural due process] violated his rights under the Fourteenth Amendment; and

"(c) The actions of the defendants were arbitrary and capricious and constituted a denial of substantive due process . . ."

■ Plaintiff's request for a judgment declaring that his transfer to the position of jailer on February 28, 1975 was constitutionally impermissible is well taken in light of the Court's findings in law and fact. Judgment will be entered accordingly. With regard to the low quarterly marks this Court cannot begin to judge the extent of the taint reflected in defendants' job ratings since April 1, 1975. Under the circumstances of this case, the Court will enter judgment declaring all ratings received by plaintiff from April 1, 1975 until the date of this opinion constitutionally invalid. The Court will withhold granting a declaratory judgment on grounds of a denial of substantive due process, finding that liability imposed on the grounds alleged in the complaint supplants any need for this judgment.

The Court will reserve judgment on the question of plaintiff's rights to a hearing dressed with elements of procedural due process in this context until further briefing. The question of a reasonable attorney's fee will be considered at the same time. Parties will await further notice from the Court with regard to the disposition of these issues.

In his request for injunctive relief plaintiff requests that a mandatory injunction issue ordering defendant Weeks to reinstate Lt. Simpson to his former position with the Residential Area Patrol and that these defendants be restrained from taking further illegal and unconstitutional punitive actions against plaintiff on the grounds alleged in this complaint. This Court is mindful of

the hazards of federal intrusion in the management of local government entities. However, in the interest of complete relief the Court will· enjoin these defendants as set forth above, with the slight modification that plaintiff may, if he chooses, remain in his present assignment.

Plaintiff prays that actual damages be assessed against these defendants jointly and severally in the amount of $15,000.00. In addition, plaintiff. requests that punitive damages be assessed against the defendants jointly and severally in the amount of $10,-000.00.

Plaintiff has introduced no evidence in this case for the purpose of proving a monetary loss on his part by reason of defendants' actions. Instead plaintiff has directed the Court's attention to authority for the proposition that in the field of civil rights, Courts may award non-punitive damages to compensate a person deprived of intangible rights where no monetary loss has been shown. *See* Antieau Federal Civil Rights Act—Civil Practice (1976 Supp.). Plaintiff suggests to the Court that in the absence of an objective standard to determine monetary damages in this regard, the Court should consider the nature of the constitutional deprivation and the magnitude of mental distress and humiliation plaintiff has suffered in arriving at an award.

A convincing argument can be made that fundamental constitutional rights may be rendered worthless if deprivations of these rights go without redress merely because they are intangible in nature and not readily valued in monetary terms. This argument has equal application in circumstances such as those present here where punishment is imposed based upon suspicion that these rights were exercised. Viewed in this light, an award of compensatory damages under these circumstances is not unlike punitive damages without actual damages. Finding that punitive damages are proper in this case, the Court will not attempt to arrive at a compensatory award in the abstract. The Court will award actual damages in favor of the plaintiff against these defendants jointly and severally in the nominal amount of Three Dollars ($3.00).

Punitive damages are proper where it is established that the injury to the plaintiff was either maliciously, wantonly or oppressively done. An act is maliciously done if accompanied by ill will, spite or grudge. An act is wantonly done if done in reckless disregard or indifference to the rights of another. An act is oppressively done if done in a way or manner which violates the right of another person with unnecessary harshness or severity as by misuse or abuse of authority or power.

It is the opinion of this Court that punitive damages are warranted against all three of these defendants on at least two of the grounds mentioned above. Their actions causing damage to plaintiff clearly exhibited misuse and abuse of their authority. Moreover, their avenging desire to ruin plaintiff's career was spiteful to say the least.

In recognition of the exemplary nature of these awards the Court will award punitive damages against these defendants and in favor of the plaintiff on an individual basis. In favor of plaintiff against Chief Gale F. Weeks the Court awards punitive damages in the amount of Three Thousand Dollars ($3,000.00). In favor of plaintiff against John ˙C. Terry the Court awards punitive damages in the amount of Two Thousand Dollars ($2,000.00). In favor of plaintiff against Lt. Forrest Parkman the Court awards punitive damages in the amount of One Thousand Dollars ($1,000.00).

Entry of judgment in this case will await resolution of the pending issues mentioned above.