No. 82-54

IN THE SUPREME COURT OF THE STATE OF MONTANA

1983

DONALD PURCELL and JOSEPH B. GARY,

Plaintiffs and Respondents,

-vs-

AUTOMATIC GAS DISTRIBUTORS, INC.,
a Colorado Corp., E.D. ORSER, et al.,

Defendants and Appellants.

APPEAL FROM: District Court of the Eighteenth Judicial District,
In and for the County of Gallatin,
The Honorable Gordon Bennett, Judge presiding.

COUNSEL OF RECORD:

For Appellants:

Crowley, Haughey, Hanson, Toole & Dietrich; Robert Edd
Lee argued, Billings, Montana
Berg, Coil, Stokes & Tollefsen; Ben Berg, Jr., Bozeman,
Montana
John F. Blackwood, Livingston, Montana

For Respondents:

Landoe, Brown, Planalp, Kommers & Lineberger; James M.
Kommers argued, Bozeman, Montana

Submitted: October 31, 1983

Decided: December 19, 1983

Filed:

*Ethel M. Harrison*

Clerk

Mr. Justice Frank B. Morrison, Jr. delivered the Opinion of the Court.

The plaintiffs (Respondents) in a bench trial, recovered judgment against defendants (Appellants) for compensatory damages arising out of breach of contract as well as $50,000 in favor of each plaintiff for exemplary damages. Defendants Automatic Gas Distributors, Inc., (Automatic Gas) and E. D. Orser (Orser), do not appeal the award of compensatory damages for breach of contract but do appeal the award of punitive damages in the amount of $50,000 for each plaintiff. The defendants Western Crude Oil, Inc., (Western Crude) and Spruce Oil Corporation (Spruce Oil) appeal the entire judgment entered against them.

Western Crude owns Spruce Oil (a wholesaler and unbranded jobber) and also owns Automatic Gas (an unbranded retailer). Automatic Gas provided gasoline and pumps, meters, and other facilities, to retail operators, who were in the business of "serve yourself" gasoline sales. The retailers split profits with Automatic Gas. The two respondents were retail operators. Spruce Oil provided Automatic Gas a security of supply, having superior access to refineries, but gave Automatic Gas no special prices. Automatic Gas was not bound to supply its local operators with gasoline from Spruce Oil, but the local operators were required through a marketing agreement to obtain their gasoline from Automatic Gas in return for Automatic's installation of pumps, meters and tanks.

Automatic Gas had an agreement with appellant Orser to pay him ½ cent per gallon of gasoline sold by the operators Orser found for Automatic Gas. Although Automatic's marketing agreement with the local operators did not reflect

2

any obligation on the part of the local operators to pay any part of Orser's commission, nevertheless Automatic Gas withheld the Orser commission as part of the "cost of gas".

Five local operators sued for damages arising from Automatic's withholding Orser's commission before splitting the net proceeds with them. The facts relating to each of the five original plaintiffs were different. Three of the operators obtained judgments for both punitive and compensatory damages and no appeal was taken in those cases. In the cases where judgment was entered but not appealed from, there was testimony that each of the operators was falsely assured by Orser that Automatic Gas had access to lower gasoline prices and that the savings would be passed onto them. This evidence is not present in the record supporting a judgment in favor of the respondents here.

The trial court assessed punitive damages on the basis of fraud and termed the Orser payment a "commission rip-off." If there is substantial credible evidence in the record to support the trial court's findings, the trial court must be affirmed. This is true though the evidence in support is inherently weak. Lacey v. Herndon (Mont. 1983), 668 P.2d 251, 40 St.Rep. 1375. Additionally, the evidence must be viewed in a light most favorable to the respondents. Grimsley vs. Estate of Spencer (Mont. 1983), 670 P.2d 85, 40 St.Rep. 1585.

The respondents, as retailers, were solely responsible for collecting gasoline proceeds and depositing these proceeds in bank accounts set up by Automatic Gas. All petroleum products were purchased and paid for by Automatic Gas. Respondents relied upon Automatic Gas for an accounting

3

of all monies. The net receipts to be split were calculated by subtracting the "total cost of gasoline delivered" from the gross retail sales receipts. Such cost of gasoline was defined by the marketing agreement as follows:

> "b.) Total Cost of Gasoline Delivered is defined as the total delivered cost, which shall include the Distributor's cost of purchasing the gasoline, all freight costs and all applicable local, state and federal gasoline taxes and charges at and into the Distributor's dispensing equipment located as specified herein."

The trial court in its Findings of Fact and Conclusions of Law, paragraph 4 of the findings of fact, found as follows:

> "4. In addition to the items authorized by paragraph 8 of the agreement to be utilized in arriving at net receipts, Automatic Gas included an amount representing a commission of one-half cent per gallon on all gasoline sales to be paid to E. D. Orser, one-fourth cent to be paid by Automatic Gas and one-fourth cent to be paid out of the marketer's share of gross receipts. With respect to sales of diesel fuel by Plaintiff Purcell, a commission of one-fourth cent per gallon was paid to Orser, with one-eighth cent per gallon being charged to Automatic Gas and one-eighth cent per gallon charged to the marketer. The commissions paid to E. D. Orser were not an item of cost of gasoline or diesel fuel as specified in paragraph 8 of the agreement."

Regular monthly statements were supplied by Automatic Gas to the retailers. A sample commission statement was as follows:

GAS COMMISSION, MONTH OF JANUARY, 1977

SALES        (METERED DOLLARS):

|  | | |
|---|---|---|
| Regular | $ 14,974.78 | |
| Premium | 2,897.69 | |
| No Lead | 1,905.03 | |
| TOTAL | | $ 19,777.50 |

SALES OR NET RECEIPTS                    $ 19,777.50

COST OF SALES:

4

| GALLONS | PRODUCT | COST | DOLLAR AMOUNT | |
|---------|---------|------|---------------|---|
| 25,864 | Regular | .51774 | 13,390.83 | |
| 4,838 | Premium | .54516 | 2,637.48 | |
| 3,234 | No Lead | .52862 | 1,709.56 | |
| 33,936 | | | | $ 17,737.87 |

| | |
|---|---|
| NET PROFIT | 2,039.63 |
| Equipment Amortization | (200.00) |
| Adjusted Net Profit | 1,839.63 |
| Operating Expense | 200.00 |
| | 2,039.63 |
| | |
| 1/2 Due Bozeman | 1,019.82 |
| Robbery payment | (182.11) |
| Apply on Note Payment | (76.90) |
| Interest | (18.85) |
| NSF | (174.15) |
| Short Payment | (594.42) |
| Deposit Correction | 26.61 |
| | -0- |

GALLONS SOLD THIS MONTH LAST YEAR    43,676

GALLONS SOLD YEAR TO DATE    33,936

INVENTORY OVER/SHORT    +880

The Orser commission is not identified but was included in the amount shown as product cost. The record is in conflict about the knowledge of respondents respecting the Orser commission. However, the clear preponderance of the evidence is that, at the time each of the respondents contracted with Automatic Gas, they did not know the Orser commission was going to be charged to them. The following testimony was elicited from respondent Gary on direct examination:

"Q. Do you know whether or not Mr. Ed Orser's commission was included in the cost of gasoline?

"A. My understanding, I didn't know how Ed Orser got paid. I never knew until you advised me that we were paying Ed Orser a commission. I never knew that until you told me."

On cross-examination respondent Gary testified as follows:

"Q. When you had some questions as to the acquisition cost of the gasoline by Automatic Gas,

5

did you ever ask Mr. Ensor or Mr. Bruskotter to provide you with copies of delivery slips to show you evidence of the acquisition cost?

"A. All I, as I told you, I would receive those monthly reports and they would say that the cost of sales, this was told to me as to what that cost Automatic Gas; and let's take December, 1976. They said it cost Automatic Gas $51,000 -- .51497 cents, and no lead .52123 and then we would have to account for the dollars amount that we sold it for.

"Q. I understand that, and I understand the contents of the gasoline commission statements. What puzzles me is the fact that if that question existed, there was rather a simple way to resolve it, was there not? It was not a hidden fact by Automatic Gas.

"A. Certainly. Ed Orser was certainly a hidden fact.

"Q. I didn't ask about Mr. Orser but about the acquisition cost of the gasoline.

"A. This is what I was told. I assumed what they were telling me was correct. I assumed they were an honest company and that that was what it was costing them.

"Q. Did you ever ask Mr. Orser or Mr. Bruskutter to provide you with documentation evidencing the acquisition cost of gasoline?

"A. According to what Mr. Berg introduced in evidence, apparently I did at one time; and they apparently supplied it to me. I don't remember it, though, to be very honest, and certainly since during this recess I have checked all those statements, and there is not one statement on there of any charge to Ed Orser."

Respondent Gary conceded on cross-examination that, pursuant to his request, at a time subsequent to his contracting, information about the Orser commission was supplied to him. Notwithstanding this concession, it is clear from the record that there was a period of time when the Orser commission was withheld from respondent Gary without his knowledge and in contravention of the agreement herein set forth.

Respondent Purcell succeeded to the interest of Franks. There is evidence that Franks knew of the Orser commission but there is substantial credible evidence in the record to support a finding that the Orser commission was withheld from Purcell, in contravention of the agreement, without Purcell's knowledge.

The trial court found compensatory damages accruing to respondent Gary in the sum of $7,091.50 representing the amount of the Orser commission improperly withheld. Likewise, the trial court found the sum of $6,107.50 was wrongfully withheld from respondent Donald Purcell. With respect to Purcell there was an offset. The compensatory awards for wrongfully withholding the Orser commission in contravention of the marketing agreement, were not appealed. These awards are grounded in breach of contract. The award of punitive damages, based upon fraud, forms the basis for this appeal. The court did not make a compensatory award for fraud but found there were actual damages.

The trial court entered the judgment against all defendants including Spruce Oil and Western Crude. The basis for the award against Western Crude and Spruce Oil was that they were part of a scheme to defraud the respondents. The following finding shows the trial court's reasoning:

> "The bad faith dealing implicit in their pricing scam is made explicit in their commission rip-off. There may be reason to believe they did not act together and in concert, as suggested by defendants, but none appears in the record, which militates ineluctably to the conclusion that there was a high degree of cooperation between the three segments of this corporate conglomerate operating out of the same building. The credulity of the most naive observer would be reached in attempting to believe that Western Crude was uninvolved in or unaware of the operations of its two wholly-owned subsidiaries."

7

The following two issues are presented in this appeal:

1. Is there a sufficent factual basis in the record to the support an award of punitive damages against all the defendants or any of them?

2. Is there evidence in the record to support any judgment against Western Crude and Spruce Oil?

Punitive damages are governed by section 27-1-221, MCA, which provides as follows:

> "When exemplary damages allowed. In any action for a breach of an obligation not arising from contract where the defendant has been guilty of oppression, fraud, or malice, actual or presumed, the jury, in addition to the actual damages, may give damages for the sake of example and by way of punishing the defendant."

If the conduct of a particular defendant is tortious, the fact that there was an underlying contract, does not defeat an award of punitive damages. Gates vs. Life of Montana Ins. Co. (Mont. 1983), 668 P.2d 213, 40 St.Rep. 1287. In this case the trial court found fraud which, if present in the record, would constitute a tort and provide a basis for an award of exemplary damages.

Section 28-2-404, MCA, states:

> "Fraud is either actual or constructive. Actual fraud is always a question of fact."

Section 28-2-405, MCA, defines actual fraud, in relevant part, as follows:

> "Actual fraud, within the meaning of this part, consists in any of the following acts committed by a party to the contract or with his connivance with <u>intent to deceive</u> another party thereto or to <u>induce him to enter</u> into the contract:" (emphasis added)

For respondents to succeed in establishing a claim premised upon actual fraud they would have to show that defendants had an "intent to deceive" and in furtherance

8

thereof suppressed that which they knew to be true. Certainly the fact that the Orser commission was being partly charged to respondents was, at first, a fact concealed. The record is very weak in support of a claim that there was an "intent to deceive".

Fraud may, pursuant to the provisions of 28-2-404, consist of constructive fraud. Constructive fraud is defined in 28-2-406, MCA, as:

"(1) Any breach of duty which, without an acutally fraudulent intent, gains an advantage to the person in fault or anyone claiming under him by misleading another to his prejudice or to the prejudice of anyone claiming under him; or

(2) Any such act or omission as the law especially declares to be fraudulent, without respect to actual fraud."

In this case there was a fiduciary duty with respect to accounting. The respondents reposed their confidence in the accounting procedures of Automatic Gas and relied upon Automatic Gas to accurately calculate the cost of the product sold. The record shows that this trust was violated and that Automatic Gas withheld the Orser commission as a cost of product. At the very least this constitutes a constructive fraud.

Section 27-1-221, MCA, allows punitive damages for fraud. Section 28-2-404, MCA, specifically defines fraud as including constructive fraud. We therefore hold that the breach of a fiduciary relationship constituting a constructive fraud forms the basis for an award of punitive damages.

Such holding accords with the "oppression" provisions of 27-1-221. This Court has defined oppression as "an act of cruelty, severity, unlawful exaction, <u>domination</u> <u>or</u> <u>excessive</u>

9

use of authority." Ramsbacher vs. Hohman (1927), 80 Mont. 480, 488, 261 P. 273,276 (emphasis supplied). Oppression was defined in Simpson vs. Weeks (D.C.Ark., 1977), 530 F.Supp 196, 207, aff'd in part 570 F.2d 240, 1978, as:

> "An act is oppressively done if done in a way or manner which violates the right of another person with unnecessary harshness or severity as by misuse or abuse of authority or power." (emphasis added)

Abuse of authority or power is also the essence of constructive fraud. Our inclusion of constructive fraud within the ambit of the fraud upon which punitive damages can be premised, finds additional support by the legislative inclusion of oppression as a proper basis for punishment.

The failure of Automatic Gas to identify the Orser commission in accounting to respondents is sufficient factual basis for a finding of oppression and fraud. We therefore affirm the trial court's award of punitive damages as to Automatic Gas.

We can find no basis in the record, beyond mere speculation, supporting the complicity of Western Crude or Spruce Oil. The trial court's finding is based upon a mere suspicion. The ownership of stock is insufficient. There is not a factual basis for finding that Automatic Gas, Spruce Oil, and Western Crude were a single corporation. In fact they were separate corporations with different functions. Since the record is bare of any evidence to support a finding of oppression or fraud as to Western Crude or Spruce Oil we must vacate the judgment as to these two defendants.

Similarly, we find no basis in the record supporting a finding of oppression or constructive fraud on the part of E.D. Orser with respect to Gary and Purcell. The essence of the wrong to these plaintiffs was the violation of the trust

10

placed in Automatic Gas to fairly calculate and disclose the "cost" of gasoline. There is no evidence that Orser had any duty to disclose Automatic Gas' accounting methods, nor that he misrepresented or hid the fact of who was paying his commission, nor that he gained any advantage by the hidden commission.

The punitive damage award, and judgment entered thereon, against Automatic Gas Distributors, Inc. is affirmed. The judgment against Western Crude Oil, Inc., Spruce Oil Corporation and E.D. Orser is vacated. The matter is remanded to the District Court with directions to enter judgment in favor of Spruce Oil Corporation, Western Crude Oil, Inc., and E.D. Orser.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

11

Mr. Justice John C. Sheehy, concurring in part and dissenting:

I concur with the majority opinion insofar as it sustains the punitive damage award in judgment against Automatic Gas Distributors, Inc., in favor of the plaintiffs Purcell and Gary. I dissent from the majority position that the judgments against Western Crude Oil, Inc., Spruce Oil Corporation, and E. D. Orser, must be vacated.

To begin with, I am at a loss to understand how the majority can set aside the judgment against Orser. He was the agent of Automatic Gas Distributors, Inc., who came to the plaintiffs, and represented to them that if they would do business with Automatic Gas Distributors, Inc., that company could obtain for them fuel supplies at a price below what the plaintiffs would otherwise have to pay, that this would lead to a lower pump price, and thus larger volume sales and larger margin of profit per gallon to be split with Automatic Gas Distributors, Inc., as "net receipts" under the agreement. None of these representations were true. When the plaintiffs purchased gas from Automatic Gas Distributors, Inc., they were charged the "rack price" that any other dealer would have to pay at any other rack in the vicinity and that any other dealer would also pay Automatic Gas without such a marketing agreement. Automatic Gas did not and could not obtain fuel supplies at a price less than that otherwise obtainable. There was no margin that would lead to a lower pump price or to a larger volume of sales. What really occurred was that Automatic Gas became half of the dealership operated by the plaintiff and by taking half of the profit, reduced by that extent the amount that the plaintiffs might reasonably have expected to obtain as a per

gallon profit if they had not dealt with Automatic Gas. Since Orser made the representations upon which the plaintiffs relied, though he was acting on behalf of Automatic Gas, it should be clear that he is equally liable with Automatic Gas for the actual loss in profits sustained by the plaintiffs, and for the punitive damages which result from his fraudulent representations. Strangely, the majority here is holding the principal and not the agent.

The majority here also does not explain adequately the intercorporate relationship between the three corporations here involved. Western Crude Oil, Inc., during the times here pertinent, owned all of the stock of Spruce Oil Corporation. Western Crude Oil, Inc. also owned all of the stock of Automatic Gas Distributors, Inc. Western Crude paid all of the salaries of the employees of its two subsidiary corporations, for which it was compensated by a later bookkeeping charge-back against the subsidiaries. The corporation's headquarters are in the same office building. It appears they used the same receptionist. They may have used the same telephone number.

But more important in the relationship between the parties, and particularly with respect to the representations that Orser made to the plaintiffs, is the "scam" which shocked the District Court, the method that Western Crude used, through its subsidiaries, to exact two profits from the plaintiffs. Thus, Spruce Oil Corporation purchased the gasoline products from refiners. It sold the products to Automatic Gas and others, at a price upon which Spruce Oil Corporation made a profit. Automatic Gas, taking the same product, then sold the same to the plaintiffs, again exacting one-half of the profits gained by the plaintiffs. The result

was that Western Crude Oil, Inc., acting through its subsidiaries, and in contravention of Orser's representations, made large volume purchases from refiners through Spruce Oil Corporation, but did not pass on the advantage of those large volume purchases to the plaintiffs, as Orser had indicated would occur. Instead, it made a profit in the transaction from Spruce to Automatic Gas, and then Automatic Gas made a profit on the efforts of the plaintiffs in selling the gasoline product. The result, as the District Court found and concluded, was predictable: the plaintiffs and the other dealers involved with Automatic Gas all lost money, three of them went broke, one bought out at a loss of $20,000, and the only survivor (Purcell) abandoned the agreement. The District Court found that "in the course of it all they had been systematically robbed of a part of their agreed-upon profit, which they were forced to recover by this action, harrassed by the accounting practices of the defendants, and forced to exhaust their resources, other businesses, and credit to continue serving the defendants at what amounted to slave wages . . ."

Western Crude's wholly owned subsidiary, Automatic Gas Distributors, Inc., employed an agent, Orser, who fraudulently induced the plaintiffs and others to enter into marketing agreements and lease agreements, and hid from them the fact that another of Western Crude's wholly owned corporations, Spruce Oil Corporation, stood behind Automatic Gas and the refiners and exacted a profit that in reality had been promised by Orser to the plaintiffs. The District Court was completely correct in assessing punitive damages against all of the defendants because all are equally responsible.

The majority opinion does not answer the cross-appeal of Purcell, who is still open to further hearings on the counterclaim on which judgment against him has been entered. So that the record may be clear for him, I would hold that the judgment on the counterclaim against him in favor of Automatic Gas is not yet final, and its merits should be determined, if necessary, in a future appeal.

_____
                Justice

Mr. Chief Justice Frank I. Haswell concurs with Mr. Justice John C. Sheehy's concurrence and dissent.

_____
            Chief Justice

Mr. Justice Daniel J. Shea will file a written opinion later.