No. 85-327

IN THE SUPREME COURT OF THE STATE OF MONTANA

1986

_____

KELLY W. TYNES and WALTER E. TYNES,

      Plaintiffs and Respondents,

  -vs-

BANKERS LIFE COMPANY,

      Defendant and Appellant.

_____

APPEAL FROM: District Court of the Eighth Judicial District,
In and for the County of Cascade,
The Honorable Thomas McKittrick, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Jardine, Stephenson, Blewett & Weaver; John Stephenson,
Jr. argued, Great Falls, Montana

    For Respondent:

        Linnell, Newhall & Martin; Norman L. Newhall argued,
Great Falls, Montana

_____

                Submitted:  September 11, 1986

                  Decided:  December 17, 1986

Filed: DEC 17 1986

<br>

_____

Clerk

Mr. Justice Frank B. Morrison, Jr. delivered the Opinion of the Court.

Bankers Life Company appeals the verdict entered in the Eighth Judicial District Court, County of Cascade, awarding Kelley and Walter Tynes judgment against Bankers Life. We affirm the jury verdict, but reverse the trial judge's decision to award the Tynes attorneys' fees.

Bankers Life is an insurance company authorized to sell group health insurance in Montana. Walter Tynes was the principal owner and employee of a family-owned plumbing shop in Great Falls. Kelley is his son. Bankers Life issued the plumbing shop group health insurance in June 1974. Kelley was originally covered under the policy as a dependent of Walter. When Kelley became nineteen in November of 1975, he was not a full-time student and no longer eligible for coverage as a dependent. Nevertheless, Walter, allegedly ignorant of Kelley's lack of eligibility, continued paying Kelley's premiums and Bankers Life continued accepting them.

Kelley has always worked at the plumbing shop. Initially, he primarily cleaned and ran errands. As he grew older, Kelley began to help at various job sites. Kelley continued working at the shop after he dropped out of high school. The work was seasonal and Kelley's, as well as the other employee's, hours were flexible.

In the spring of 1977, Kelley began exhibiting abnormal behavior. He was antisocial and lethargic. He worked at the shop only sporadically. In early July 1977, Kelley was diagnosed as suffering from acute schizophrenia and was admitted to a hospital. He escaped, suffered injuries in a car accident and was readmitted.

At this same time, Walter learned that Kelley was no longer eligible for insurance coverage as a dependent. The exact details of this discovery are unclear. The records of LaVerne (Verne) Sebens, the insurance agent who sold Walter Tynes his Bankers Life policy, indicate Sebens made a service call to the plumbing shop on July 11, 1977, and made telephone contact with Walter Tynes' bookkeeper on July 18, 1977. Sebens does not remember much about those calls. Walter testified Sebens suggested he cover Kelley as an employee of the shop. In any event, an enrollment card for Kelley Tynes, employee, dated July 10, 1977, was received July 19, 1977, by Bankers Life's billing department.

Coverage for Kelley's July and August 1977 medical bills was denied in September 1977 because Kelley was an ineligible dependent. Sebens contacted Bankers Life with respect to the denial of coverage. Nothing happened at that time. On November 1, 1977, Jo Scholl, a processor in the billing department of Bankers' Life, contacted Walter Tynes about Kelley's attempted transfer to employee status. Per Scholl's telephone memorandum, Walter's response was that Kelley had been attending school and working for Walter sporadically. Scholl agreed to transfer Kelley from eligible dependent to eligible employee starting July 10, 1977.

Kelley's July and August bills remained unpaid. Sebens again contacted Bankers Life per letter, advising that Kelley was "carried" as an employee of the plumbing shop "even though he couldn't carry his own workload." Sebens' inquiry was directed to Lil Peterson by memo noting "there is some question as to whether or not these bills are payable. Please make your usual good investigation." Peterson forwarded investigation of the problem to Jan Hatting, a senior claims processor. Hatting, after three months,

3

approved payment of bills totalling more than $3,000 in April of 1978.

Kelley's condition deteriorated. Walter contacted the Constance Bultman Wilson Center in Minnesota about admitting Kelley to the facility. Wilson Center had several prerequisites for admission, including verification of 100% financial coverage of the expenses incurred during treatment. At Walter's request, Wilson Center contacted Bankers Life about coverage of Kelley while at the Center. Wilson Center received a letter from Bankers Life stating Kelley was an insured and setting forth his maximum coverage. The letter stated in pertinent part:

> In reviewing the insured's claim we find that patient Kelley Tynes is also our insured. The insurance policy provides for $75 a day room and board benefits payable for 365 days. Hospital miscellaneous expense benefits are payable at 100 percent after a $25 hospital miscellaneous deductible. The remaining charges not covered under the basic benefits are payable under major medical at 80 percent of the first $2000 and 100 percent of the balance after the satisfaction of a $100 major medical deductible. All outpatient services are payable under major medical at 50 percent. The insured's policy allows for a major medical maximum of $250,000 per lifetime.
>
> However, this is not a guarantee of benefits, the insured must meet the requirements of his policy before benefits will be payable on his claim . . .

This letter, coupled with Walter's guaranty that he would pay all remaining bills, resulted in the Wilson Center agreeing in August of 1978 to accept Kelley. Kelley repeatedly refused to go to Wilson Center, but was finally admitted on January 1, 1979.

Meanwhile, Walter's bookkeeper had major surgery in October of 1978. The plumbing shop's books fell behind. The November and December 1978 premiums due Bankers Life were not paid. On January 1, 1979, while Walter was at the Wilson Center admitting Kelley, the policy was terminated for

4

nonpayment of premium. Walter, upon learning of the termination, sent Bankers Life a check for the delinquent premium payments and requested reinstatement on January 5, 1979.

Testimony at trial established that Bankers Life considers four criteria when determining whether to reinstate: 1) bad claims (claims exceeding premiums); 2) history of late payments; 3) "non-sufficient funds" checks; and 4) administrative problems. The plumbing shop's claims had recently exceeded its premiums. However, evidence was presented that this was not unusual for small businesses when one or more employees have major problems. Documentation on the plumbing shop's file indicated a history of late payments. Upon closer examination, however, it was determined that Bankers Life erroneously issued the late payment notices. Reinstatement was denied anyway.

Walter next contacted the Montana Insurance Commissioner's Office. Robert Abbott reviewed the policy, noting an Extended Benefits Provision for coverage of certain charges incurred after the date of termination. Coverage required that the insured be totally disabled at the time of termination and that the insured be admitted to a hospital for treatment of the disability within 90 days of termination. Abbott contacted Bankers Life regarding the application of this provision to Kelley Tynes. An investigation was commenced by Bankers Life with Verne Sebens as the investigator. After nine months, Walter Tynes was sent a letter September 13, 1979, denying coverage of Kelley because he was not an eligible employee. Nothing was resolved with respect to the Extended Coverage Provision. Evidence was submitted at trial that a similar investigation

by a professional investigator could have been completed in two weeks.

Upon notification of denial of coverage, Kelley was removed from Wilson Center. Kelley's reaction was devastating to both himself and his family. He became withdrawn and then violent. He was unable to work or to function. People were afraid of him. Testimony at trial established that Kelley should have remained at Wilson for 18 to 24 months in order to achieve optimum recovery.

In 1981, Tynes' counsel demanded that Bankers Life review their denial of benefits to Kelley. Senior personnel conducted a review of the previous investigations and affirmed the decision.

Thereafter, Kelley filed a complaint December 21, 1981, against Bankers Life seeking damages for failure to pay policy benefits (breach of contract). The complaint also alleged that Bankers Life's actions in failing to pay were oppressive, fraudulent and malicious and entitled insured to exemplary damages. An amended complaint was filed May 29, 1984, adding Walter as a plaintiff and denominating three specific counts: breach of contract; tortious breach of the implied covenant of good faith and fair dealing; and tortious violation of Montana's Insurance Code.

In its answer, Bankers Life denied Kelley was entitled to benefits and claimed the new counts were barred by various statutes of limitations. The defenses were raised by motions for summary judgment and directed verdict. The motions were denied.

Following trial in March 1985, the jury returned a special verdict awarding plaintiffs $49,167.09 on the contract claim, $100,000 for Walter's emotional distress, $100,000 for Kelley's general damages and emotional distress,

6

and $200,000 in punitive damages. Thereafter, plaintiffs filed a motion requesting over $30,000 in attorneys' fees and costs. The motion was granted.

Numerous important issues are raised by Bankers Life on appeal:

1. Should Walter and Kelley Tynes' claims have been dismissed as barred by applicable statutes of limitations?

2. Is Walter Tynes barred from any action on the contract since he is neither a party to the contract nor an intended third-party beneficiary?

3. Was Verne Sebens the agent of Bankers Life for all purposes?

4. Is the evidence sufficient to establish Bankers Life's obligation to provide coverage?

5. Did the trial judge err in refusing to rule as a matter of law that Bankers Life did not act in "bad faith?"

6. Did the trial judge erroneously submit the case to the jury on the basis of constructive fraud?

7. Did the trial judge erroneously instruct the jury on damages for emotional distress?

8. Did the trial judge erroneously award attorneys' fees and improper costs to the Tynes?

I.

STATUTES OF LIMITATIONS and THE RELATION-BACK DOCTRINE

Bankers Life denied Kelley Tynes coverage on September 13, 1979. Kelley's complaint was filed more than two years later, December 21, 1981. Walter was added as a plaintiff nearly five years after Bankers Life denied coverage. Kelley also amended his own complaint at that time to specifically allege breach of the implied covenant of good faith and fair dealing and tortious violation of Montana's Insurance Code. Bankers Life, citing Rule 15(c), M.R.Civ.P., concedes that

7

Kelley's claims relate back to the date his original complaint was filed, but then contends the claims are still barred by various two-year statutes of limitations. We disagree.

A cause of action for breach of the implied covenant of good faith and fair dealing is a separate tort action, independent of the underlying contract. Nicholson v. United Pacific Insurance Co. (Mont. 1985), 710 P.2d 1342, 1348, 42 St.Rep. 1822, 1827. Therefore, the applicable statute of limitations is that for a tort action, three years. Section 27-2-204(1), MCA.

The claim for violation of the Unfair Claims Practices Act arises out of a statutory scheme but consists of a separate cause of action, again in tort. "It is the breach of that statutory requirement, a duty independent of the insurance contract, that gives rise to tort liability. . . ." First Security Bank of Bozeman v. Goddard (1979), 181 Mont. 407, 420, 593 P.2d 1040, 1047. The three-year tort statute of limitations again applies. Bennett v. Dow Chemical Co. (Mont. 1986), 713 P.2d 992, 995, 43 St.Rep. 221, 225.

Constructive fraud was defined as fraud by this Court in Purcell v. Automatic Gas Distributors, Inc. (Mont. 1983), 673 P.2d 1246, 1251, 40 St.Rep. 1997, 2002. Section 27-2-203, MCA, provides:

> Actions for relief on ground of fraud or mistake. The period prescribed for the commencement of an action for relief on the ground of fraud or mistake is within 2 years, . . .

Thus, Bankers Life argued correctly that a cause of action premised on constructive fraud is subject to a two-year statute of limitations.

However, Tynes did not plead constructive fraud. Nor did the jury rule on the issue of constructive fraud. The

8

special verdict form referred only to breach of the implied covenant of good faith and fair dealing. The jury necessarily relied only on that claim in finding against Bankers Life. The trial judge did give instructions on constructive fraud. However, as will be discussed in part VI of this opinion, those instructions actually incorporate elements of constructive fraud into the implied covenant of good faith and fair dealing. Constructive fraud was neither pled by Tynes nor decided by the jury as a distinct claim in this case. Therefore, there is no statute of limitations problem with respect to constructive fraud.

Bankers Life argues Walter Tynes' cause of action against Bankers Life cannot relate back, pursuant to Rule 15(c), M.R.Civ.P., to the date of Kelley's original complaint because Walter alleged separate claims on his own behalf and sought damages in his own right. Whether a second plaintiff's cause of action can relate back to the date the first plaintiff's complaint was filed is a question of first impression in Montana. Our research, as well as that of the parties, reveals a split of authority in other jurisdictions on the issue. See 12 A.L.R. Fed. 233.

Statutes of limitations exist in order to insure that a defendant receives adequate notice of the claim against it. They provide a defendant with the opportunity to adequately defend. Statutes of limitations insure fairness. They prevent undue prejudice to the defendant. Cunningham by Cunningham v. Quaker Oaks Co. (W.D.N.Y. 1985), 107 F.R.D. 66, 72; Williams v. United States (5th Cir. 1968), 405 F.2d 234, 12 A.L.R. Fed. 224.

Permitting Walter's claims against Bankers Life to relate back to the date of Kelley's original complaint did not undermine Bankers Life's ability to defend itself. The

claims of the two parties are nearly identical. They arise from the exact same "conduct, transaction, or occurrence set forth . . . in the original pleading" as required by Rule 15(c), M.R.Civ.P. The pleadings contain the same causes of action. Finally, there is a "clear identity of interest" between Kelley and Walter. Walter was the original insured. He agreed, as Kelley's father, to be responsible for Kelley's medical bills incurred at Wilson Center. The only difference in the two pleadings is damages. Under these circumstances, we do not believe Bankers Life was prejudiced when the trial judge allowed Walter's claims to relate back to the date of Kelley's original complaint.

## II.

### DOES WALTER TYNES HAVE AN ACTION ON THE CONTRACT?

Bankers Life contends Walter Tynes is barred from any action on the insurance contract between Bankers Life and Kelley because Walter is neither a party to, nor an intended third-party beneficiary of, the contract.

Walter has causes of action against Bankers Life in his own right, independent of the contract between Kelley and Bankers Life. One cause of action is premised on promissory estoppel.

In Fiers v. Jacobson (1949), 123 Mont. 242, 250, 211 P.2d 968, 972, we adopted the definition of promissory estoppel found in the Restatement of the Law of Contracts, § 90:

> A promise which the promisor should reasonably expect to induce action or forebearance of a definite and substantial character on the part of the promisee and which does induce such action or forebearance is binding if injustice can be avoided only by enforcement of the promise.

Essentially, the amended complaint alleges that Bankers Life promised Wilson Center and Walter they would cover

Kelley's expenses. Walter relied on the promise in guaranteeing payment of all expenses not covered. The reliance was to Walter's detriment as Bankers Life subsequently refused to cover the charges, resulting in Walter having sole responsibility for the bills. The doctrine of promissory estoppel was invoked. (This issue is discussed in Part IV, infra.)

Further, Walter has a cause of action against Bankers Life in tort based on Hawthorne v. Kober Construction Co. (1982), 196 Mont. 519, 640 P.2d 467. In Hawthorne, 196 Mont. at 523, 640 P.2d at 469, we specifically held that privity of contract is not required to maintain an action grounded in negligence.

> We view privity to be a concept having proper application in the area of contract law. There seems to be no sound public policy argument for extending its application to tort.

The rationale is aptly explained in W. Prosser, The Law of Torts § 93 (4th ed. 1971):

> ". . . by entering into a contract with A, the defendant may place himself in such a relation toward B that the law will impose upon him an obligation, sounding in tort and not in contract, to act in such a way that B will not be injured. The incidental fact of the existence of the contract with A does not negative the responsibility of the actor when he enters upon a course of affirmative conduct which may be expected to affect the interests of another person.
>
> ". . .
>
> ". . . there are situations in which the making of the contract creates a relation between the defendant and the promisee, which is sufficient to impose a tort duty of reasonable care. By the same token, there are situations in which the making of a contract with A may create a relation between the defendant and B, which will create a similar duty toward B, and may result in liability for failure to act."

Hawthorne, 196 Mont. at 523-524, 640 P.2d at 470.

Here, Bankers Life's contract with Kelley resulted in Walter Tynes guaranteeing all unpaid medical bills incurred

by Kelley at Wilson Center. Bankers Life's failure to cover Kelley's medical bills resulted in a breach of duty owed to Walter by Bankers Life.

## III.

## WAS SEBENS AN AGENT?

The trial judge gave the following instructions:

Instruction No. 10

You are instructed that in this case, LaVerne Sebens was an agent for Bankers Life Company.

Instruction No. 11

You are instructed that the knowledge of LaVerne Sebens, as agent for Bankers Life Company, is considered to be knowledge held by Bankers Life Company.

Bankers Life objects to these instructions. Because Verne Sebens sells insurance for several different companies, Bankers Life contends he is an independent insurance broker. As such, Bankers Life contends, Sebens acts at times on behalf of the insured and at times on behalf of the insurer, depending on his responsibilities at any given moment. We reject this argument.

Sebens testified that he had been employed by Bankers Life to sell insurance for 37 years. As an independent agent, he sold other types of insurance as well. Nevertheless, Sebens enjoyed a fixed or permanent relationship of over 37 years as an insurance agent for Bankers Life. At trial, Sebens referred to himself as an insurance agent for Bankers Life. We agree with Sebens assessment of his position.

Bankers Life established a principal/agent relationship with Sebens. It enlisted Sebens' aid in investigating Kelley's claims, gaining access to Kelley's work records and

communicating with Walter.  All but one contact with Walter by Bankers Life was made by Sebens.

The weight of authority, albeit primarily statutory authority, is that "a soliciting agent of an insurance company is the agent of the insurer and not of the insured for the purpose of soliciting and procuring the insurance and preparing the application."  See 16 J. Appleman, Insurance Law and Practice § 8697, p. 276 (1981) and cases cited therein.  Therefore, Sebens was acting as Bankers Life's agent when he suggested Walter enroll Kelley as an employee. The giving of Instruction No. 10 was not error.

Instruction No. 11, that Sebens' knowledge is considered to be knowledge held by Bankers' Life, is a correct statement of law with respect to the acts of Sebens related to this lawsuit.

> The rule that knowledge gained by an agent of an insurance company as to matters within the general scope of his authority is imputable to the company does not require the citation of authority.

Wells-Dickey v. American Alliance Insurance Co. (1924), 69 Mont. 586, 591, 223 P. 489, 490.

## IV.

## COVERAGE

Walter testified at trial that the insurance company (Sebens) suggested Kelley be enrolled as an employee of the plumbing shop.  Sebens did not deny making that suggestion. An enrollment card was completed and submitted to Bankers Life on behalf of Kelley.  This application constitutes an offer.  1 A. Corbin, Contracts § 82, p. 354 (1963).  Neither acceptance nor refusal of the offer was communicated to the Tynes.  Walter Tynes, believing Kelley had a contract for insurance with Bankers Life, continued paying premiums. Numerous premiums on behalf of Kelley were accepted by

13

Bankers Life, leaving the Tynes with the reasonable belief that Bankers Life had accepted Kelley as an insured. Bankers Life subsequently refused to provide Kelley coverage, claiming he was not an eligible employee.

In response to requests from Walter Tynes and Verne Sebens, claims personnel investigated Kelley Tynes' employee status. It was determined Kelley was an eligible employee after all and his medical bills were paid. The insurance company had not only accepted Kelley's offer, but had executed the insurance contract.

Subsequently, Bankers Life represented to Wilson Center that if it accepted Kelley Tynes as a patient, a large portion of the cost of his treatment would be covered by Bankers Life. Bankers Life later reversed this representation, alleging Kelley was not an eligible employee.

We must examine the legal principles of estoppel, waiver and fraud to determine if error was committed by the trial court. This Court has defined the elements of promissory estoppel as:

> (1) a promise clear and unambiguous in its terms; (2) reliance on the promise by the party to whom the promise is made; (3) reasonableness and foreseeability of the reliance; (4) the party asserting the reliance must be injured by the reliance. (Citations omitted.)

Keil v. Glacier Park, Inc. (1980), 188 Mont. 455, 462, 614 P.2d 502, 506.

The jury was given this instruction on promissory estoppel:

> A promise which Bankers Life Company should reasonably expect to induce action on the part of Kelley Tynes or Walt Tynes, and which does induce such action is binding if injustice can be avoided only by enforcement of the promise. (Ct.Inst. No. 22)

14

We find the instruction accurately states Montana law under the authority of Keil, supra.

There was abundant evidence to support a jury finding of promissory estoppel. Bankers Life treated Kelley as an insured when it paid his medical bills in April of 1978. It also represented to Wilson Center that Kelley was an insured. By these acts, Bankers Life promised to pay Kelley's medical bills, including those incurred at Wilson Center. Tynes relied on this promise when admitting Kelley to Wilson Center. Reliance was reasonable and foreseeable as Kelley's admittance hinged on financial coverage of the costs. Tynes were injured by this reliance when Bankers Life refused to cover the expenses incurred at Wilson Center. Kelley was injured because he was denied the insurance coverage he had been promised. Walter's injury occurred because he had guaranteed all costs incurred at Wilson Center not covered by insurance.

Next we must determine if waiver was properly treated by the trial court. In 1978, Bankers Life investigated Kelley Tynes' employee status at the plumbing shop. At the close of that investigation, Bankers Life found Kelley to be an eligible employee.

> Waiver is generally defined as a voluntary and intentional relinquishment of a known right, claim or privilege. . . Waiver may be proved by express declarations or by a course of acts and conduct so as to induce the belief that the intention and purpose was to waive. (Citations omitted.)

Kelly v. Lovejoy (1977), 172 Mont. 516, 520, 565 P.2d 321, 324.

The jury was instructed with respect to waiver in Instruction No. 19:

> A waiver is defined as the intentional and voluntary relinquishment of a known right, claim or privilege. A waiver can also arise by conduct, in

15

which case it is called an "implied waiver". An implied waiver can occur only if the party relies on the waiver to his detriment.

If you find that Bankers Life Company, by its conduct, has waived its right to deny coverage to Kelley Tynes, and if you find further that Walt and Kelley Tynes relied on such waiver to their detriment, then Bankers Life has waived its right to deny coverage.

Bankers Life alleges it could not have waived its right to deny coverage in 1978 because it did not know Kelley was not an eligible employee. That might have been true had Bankers Life not made an independent investigation of Kelley's employee status. But, having undertaken to determine in 1978 whether Kelley was covered and determining that he was, Bankers Life could have been found by the jury to have relinquished any defense it might otherwise have had.

Bankers Life claims the facts of employee status were misrepresented. This issue was properly submitted to the jury in Instruction No. 21.

If Bankers Life Company, claiming to have been defrauded, makes an independent investigation of the subject matter of the alleged false representation, and its decision to engage in the transaction is the result of its independent investigation and not its reliance upon the representation, then it may not deny coverage, even though the representation is false.

There was sufficient credible evidence for the jury to find that Bankers Life relied on its own investigation. Under one or more of these theories the jury could find coverage.

## V.

## BAD FAITH

Bankers Life contends there was a debatable question whether Kelley Tynes was an eligible employee and thus entitled to insurance coverage. Further, Bankers Life attributes the delay in its determination of the coverage issue to false representations by the Tynes with respect to

16

Kelley's employment status. Therefore, Bankers Life asserts, it was not exercising bad faith in denying coverage. The jury should have been so instructed as a matter of law.

Whether the issue of coverage is "fairly debatable" is a jury question. Sparks v. Republic National Life Ins. Co. (Ariz. 1982), 647 P.2d 1127, 1137. The court gave the following correct instruction:

> If there is a debatable question of insurance coverage which provides Bankers Life with a reasonable and valid ground on which to oppose payment of the proceeds of the policy, the insurance company has the right to have the coverage question determined in a court of law. Therefore even if you find that there is coverage under the Bankers Life group policy for Kelley Tynes, and that there are benefits due under the insurance contract, there can be no liability for bad faith if you find that Bankers Life had reasonable grounds to debate the coverage in a court of law. (Ct's. Instr. No. 32)

The jury found against Bankers Life on the issue.

Again the jury's determination is supported by ample evidence. Bankers Life had the duty to investigate Kelley's claims and coverage promptly. Egan v. Mutual of Omaha Ins. Co. (Cal. 1979), 598 P.2d 452, 456-457. There was ample evidence that Bankers Life failed to fulfill its duty. Bankers Life investigated Kelley's status three times, granting coverage once, before finally denying coverage. The final investigation took nine months. Evidence was submitted that had a professional undertaken the investigation, it could have been concluded within two weeks. Meanwhile, the Tynes incurred nine months of bills at Wilson Center. Bankers Life failed to inform the Tynes of the potential for coverage under the Extended Benefits Provision of the policy. Finally, Bankers Life's acceptance of premiums for Kelley and payment of Kelley's smaller claims followed by denial of coverage with respect to his large claims, smacked of bad faith. We find no error.

17

VI.

CONSTRUCTIVE FRAUD

The jury was instructed concerning fiduciary duties as follows:

Instruction No. 26

Under the law in Montana, an insurance company owes what is called a fiduciary duty to its insured, the policy holder. This duty is no less than that of a trustee. The insurance company is bound to act in the highest good faith towards the insured, and may not obtain any advantage over the insured by misrepresentation, concealment, threat, or adverse pressure of any kind.

Instruction No. 33

Constructive fraud is defined in the laws of Montana as:

"any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault or anyone claiming under him by misleading another to his prejudice or to the prejudice of anyone claiming under him." (§ 28-2-406(1), M.C.A.)

In order to find liability for constructive fraud, you must find that Bankers Life made false statements of fact or withheld or concealed facts and that such falsely stated or withheld facts misled the plaintiffs or one of them to their prejudice resulting in an advantage to Bankers Life. In order to prove constructive fraud it is not necessary to show that Bankers Life acted with intent to deceive or mislead.

Bankers Life objected at trial and objects now to these instructions, claiming there is no fiduciary duty between an insured and an insurer.

The question of whether a fiduciary relationship exists between an insurer and an insured has been the subject of discussion by a number of appellate courts. The jurisdictions of Wisconsin, Kentucky and California consider most relationships between insureds and insurers to be fiduciary in nature, although not necessarily identical to the fiduciary relationship in a formal trust.

18

In Benke v. Mukwonago-Vernon Mutual Insurance Co. (Wis. App. 1982), 329 N.W.2d 243, the insurance company fired its own expert and refused to rely on his report after the expert determined plaintiffs' arena roof collapsed due to wind, rather than to snow. The policy covered damage caused by wind and excluded damage caused by snow. Thereafter, the insurer hired a second expert who determined that snow caused the collapse. The second expert was relied on at trial. In affirming a jury verdict finding bad faith, the appellate court stated:

> We are not holding that an insurance company is open to suit for bad faith every time it rejects the opinion of the first expert retained and hires a second or third instead. An insurance company may have perfectly good reasons for not relying on the first expert hired . . . We are simply stating the rule that an insurance company has a fiduciary duty to act on behalf of the insured and to exercise the same standard of care that the insurance company would exercise were it exercising ordinary diligence in respect to its own business. (Emphasis supplied.) (Citation omitted.)

Benke, 329 N.W.2d at 248.

In Feathers v. State Farm Fire and Casualty Co. (Ky.App. 1983), 667 S.W.2d 693, the insurer denied coverage under a fire insurance policy on the "reasonable belief that said fire was the result of arson." Insureds filed a complaint requesting recovery for the losses under the policy, claiming breach of "a duty to act in good faith in effecting a fair and reasonable settlement . . . without harassment or unreasonable delay;" and claiming refusal by the insurer to deal with the insured fairly, resulting in insured suffering from acute anxiety and mental suffering. In holding against the insurer, the Kentucky appellate court stated:

> [O]nce the policyholder has substantially complied with the terms and conditions required by the policy, and there is no substantial or credible evidence that the policyholder directly or indirectly set fire to his property for personal gain, then at that point, the insurance company

19

> becomes akin to a fiduciary as to the sums that may
> be owed under the policy. (Emphasis supplied.)

Feathers, 667 S.W.2d at 696.

The California Supreme Court has recently reaffirmed its holding in Egan v. Mutual of Omaha, supra, stating that the relationship between an insured and an insurer is a fiduciary one.

> In addition an insurer holds itself out as a fiduciary. With the public trust must go private responsibility consonant with the trust, including qualities of decency and humanity inherent in the responsibilities of a fiduciary.

Frommoethelydo v. Fire Insurance Exchange (Cal. 1986), 721 P.2d 41, 44.

These courts are defining fiduciary duties applicable to insurers in a different way from the definition that applies to the true trust relationship. In the classic trust, the trustee considers only the interest of the beneficiary or the one for whose protection the trust relationship exists. The duties of a trustee under Montana law are defined in §§ 72-20-201, et seq., MCA. Not all of those obligations are applicable to an insurer who is in the business of providing insurance for a profit and must necessarily act in its own interest as well as in the interests of its insured. There may be times when the interest of the insurer and the insured conflict. The provisions of § 72-20-204, MCA, would not seem to be appropriate for regulating the relationship between insurer and insured. That section provides:

> Conflict of interest prohibited -- exceptions. Neither a trustee nor any of his agents may take part in any transaction concerning the trust in which he or anyone for whom he acts as an agent has an interest, present or contingent, adverse to that of his beneficiary, except as follows:

> (1) when the beneficiary, having capacity to contract, with full knowledge of the motives of the trustee and of all other facts concerning the transaction which might affect his own decision and

without the use of any influence on the part of the trustee, permits him to do so;

(2) when the proper court, upon the like information of the facts, grants the like permission, the beneficiary not having capacity to contract; or

(3) some of the beneficiaries, having capacity to contract and some not having it, the former grant permission for themselves and the proper court for the latter, in the manner above prescribed.

Under this statute, if applicable to the insurance relationship, an insurer would always have to act in the best interests of the insured disregarding the interests of the insurer. This would not be workable. An insurance company must consider the interests of both itself and its insured, but must act in the highest good faith toward the insured.

Section 72-20-201, MCA, provides:

Trustee's obligation of good faith. In all matters connected with his trust, a trustee is bound to act in the highest good faith toward his beneficiary and may not obtain any advantage therein over the latter by the slightest misrepresentation, concealment, threat, or adverse pressure of any kind.

This statute was essentially given to the jury in Instruction No. 26. In Instruction No. 33 the court told the jury that the essence of liability under these theories depended upon the jury finding that the insurer misrepresented or concealed in order to gain an advantage over plaintiffs. In doing so, the court properly instructed the jury on the duties which are owed by an insurer to an insured. Britton v. Farmers Ins. Group (Mont. 1986), 721 P.2d 303, 43 St.Rep. 641.

Fiduciary duties, as they have been defined in this case, are simply a statement of the kind of good-faith duty owed by an insurer to an insured. The implied covenant of good faith and fair dealing, as recognized in numerous insurance cases decided by this Court (see Britton v. Farmers

21

Ins., supra. and cases cited therein), proscribes the misrepresentation, concealment, threat or adverse pressure, referred to in court's Instruction No. 26. Instructions No. 26 and 33 do no more than define the good faith duty owed by Bankers Life to the Tynes and the giving of those instructions was not error.

## VII.

### EMOTIONAL DISTRESS

Bankers Life contends the jury was improperly instructed on emotional distress for two reasons. First, the jury was improperly told in Instruction No. 40 that they _must_ award damages for emotional distress should they find in favor of Tynes.

> If, under the court's instructions, you find that either of the plaintiffs is entitled to a verdict against Bankers Life Company, you _must_ then award that plaintiff damages in an amount that will reasonably compensate him for all loss or harm, provided that you find it was suffered by him and proximately caused by the defendant's conduct. The amount of such award _shall_ include:
>
> Reasonable compensation for any pain, discomfort, fears, anxiety and other emotional distress suffered by the plaintiff.
>
> No definite standard or method of calculation is prescribed by law by which to fix reasonable compensation for emotional distress. Nor is the opinion of any witness required as to the amount of such reasonable compensation. In making award for emotional distress you shall exercise your authority with calm and reasonable judgment and the damages you fix shall be just and reasonable in the light of the evidence. (Underlining supplied.) (Court's Instruction No. 40)

The word "must" is qualified by the language "provided that you find it was suffered by him and proximately caused by the defendant's conduct." If the jury found Tynes suffered emotional distress as a result of Bankers Life's conduct, the jury was required to award damages for that emotional distress. The instruction is correct in that respect.

We agree with Bankers Life's second allegation. No instruction was given with respect to our requirement in Johnson v. Supersave Markets, Inc. (Mont. 1984), 686 P.2d 209, 213, 41 St.Rep. 1495, 1500, that there must be a substantial invasion of a legally protected interest causing a significant impact upon plaintiff before damages for emotional distress can be awarded. However, Bankers Life did not object to the incomplete nature of the instruction at the trial court level. Instead, it complained that the evidence presented did not meet the standard of proof adopted in Johnson, supra. There was sufficient evidence of significant emotional distress. We refuse to consider appellant's contention that the instruction was incomplete in not requiring a substantial invasion and a significant impact because no objection was made to this language deficiency.

The verdict with respect to damages for emotional distress is affirmed.

## VIII.

### ATTORNEYS' FEES

Following trial, Tynes sought and were awarded $30,937.39 in costs, $20,126.99 of which was attorneys' fees and $9,585.28 of which was deposition costs, including air fare. The attorneys' fees awarded are 11% of Tynes' counsels' contingency fees. Eleven percent represents that portion of the total award attributable to actual medical costs. The attorneys' fees award is based on California's policy of allowing attorneys' fees attributable to recovery of the amount due under the insurance policy.

> When an insurer's tortious conduct reasonably compels the insured to retain an attorney to obtain the benefits due under a policy, it follows that the insurer should be liable in a tort action for that expense.

Brandt v. Superior Court (Cal. 1985), 693 P.2d 796, 798.

23

We have not adopted this policy in Montana and do not choose to do so today. The award of $20,126.99 in attorneys' fees is vacated.

We affirm the award of $9,585.28 for expenses associated with the taking of depositions. Section 25-10-201(9), MCA, allows the recovery of reasonable and necessary expenses. The depositions were reasonable and necessary as the witnesses were beyond the subpoena power of the court and Bankers Life refused to voluntarily produce them in Montana for trial. The trial judge did not abuse his discretion in awarding the costs associated with the depositions.

Affirmed in part; vacated in part.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____
Justices

Mr. Justice Fred J. Weber dissents as follows:

In part I, the majority opinion deals with the issues on statutes of limitation. The majority points out that constructive fraud was defined as fraud by this Court in Purcell v. Automatic Gas Distributors (Mont. 1983), 673 P.2d 1246, 1251, 40 St.Rep. 1997, 2002. Next, reference is made to § 27-2-203, MCA, which sets a two year statute of limitation for actions for relief on the ground of fraud. I agree with the conclusion in the majority opinion that Bankers Life correctly argued that a cause of action premised on constructive fraud is subject to a two year statute of limitation.

However, the majority next concludes that plaintiffs did not plead constructive fraud and that the jury did not rule on constructive fraud, as demonstrated by the special verdict form which referred only to the breach of the implied covenant of good faith and fair dealing. I disagree with that construction of the special verdict form. The form stated as follows:

---

SPECIAL JURY VERDICT

---

We, the Jury, answer the following questions as follows:
1. Do you find in favor of [check one]:
   _X_ Kelley W. Tynes and Walter E. Tynes, Jr.?
   ___ Bankers Life Company?
If you find in favor of Bankers Life Company, do not proceed further, but advise the Bailiff that you have reached a verdict.
2. If you find in favor of Kelley W. Tynes and Walter E. Tynes, Jr., what amount of damages, if any, do you assess for the following:

For medical expenses:        The sum of $ 49,167.09  ;

For emotional distress
and general damages of
Kelley W. Tynes:             The sum of $ 100,000.00;

25

For emotional distress of
Walter E. Tynes, Jr.:        The  sum  of  $ 100,000.00;

3.  Do you find that Bankers Life Company has breached
the implied covenant of good faith and fair dealing [check
one]:
        _X_  Yes.
        ___  No.
If your answer is "No", do not proceed further, but
advise the Bailiff that you have reached a verdict.
        4.  If your answer is "Yes", do you find that Bankers
Life Company acted with oppression, fraud or malice as de-
fined in the instructions?
        _X_  Yes.
        ___  No.
If your answer is "No", do not proceed further, but
advise the Bailiff that you have reached a verdict.  If your
answer is "Yes", what amount do you assess as punitive
damages:
        The sum of $ 200,000.00
        Dated this _11_ day of March, 1984.

                                S/_____
                                  FOREPERSON

The verdict demonstrates that the jury found in favor of the

two plaintiffs and assessed medical expenses, emotional

distress, and general damages for both plaintiffs at a total

of $249,167.09 without any reference to the legal theory upon

which they made that award.

        Court's Instruction No. 13 stated in pertinent part as

follows:


Instruction No. 13

        Plaintiffs seek recovery on three [sic] theo-
ries of liability as follows:
        1.  Breach of contract;
        2.  Promissory Estoppel;
        3.  Tort of bad faith, based upon either
            (a)  an  alleged  violation  of  Montana
Insurance Code; or
            (b)  an alleged breach of implied duty of
good faith to perform insurance contract;
        4.  Constructive fraud.
        . . .

Court's Instruction No. 33 on constructive fraud was:


Instruction No. 33

        Constructive fraud is defined in the laws of
Montana as:


26

"any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault or anyone claiming under him by misleading another to his prejudice or to the prejudice of anyone claiming under him;" (§28-2-406(1), M.C.A.)

In order to find liability for constructive fraud, you must find that Bankers Life made false statements of fact or withheld or concealed facts and that such falsely stated or withheld facts misled the plaintiffs or one of them to their prejudice resulting in an advantage to Bankers Life. In order to prove constructive fraud it is not necessary to show that Bankers Life acted with intent to deceive or mislead.

I conclude that the issue of constructive fraud was barred by the two year statute of limitation and was improperly presented to the jury under the foregoing instructions. It is not possible to tell whether any of the damages awarded in paragraph 2 of the special verdict form were based on a constructive fraud theory. "Where it is impossible to say upon what theory or under what part of the court's instructions a verdict is based, error in any one of the instructions which is prejudicial and which may influence the jury entitles the unsuccessful party to a new trial." Roberts Realty Corp. v. City of Great Falls (1972), 160 Mont. 144, 159, 500 P.2d 956, 964. I would therefore reverse the District Court and send the matter back for new trial.

In part III, the majority deals with court's Instructions No. 10 and 11. I conclude that Instruction No. 11 is deficient. It states:

Instruction No. 11

You are instructed that the knowledge of LaVerne Sebens, as agent for Bankers Life Company, is considered to be knowledge held by Bankers Life Company.

This instruction requires a conclusion by the jury that all knowledge of Mr. Sebens must be considered knowledge held by

Bankers Life. I do not believe that is a correct instruction under Wells-Dickey Co. v. American Alliance Ins. Co. (1924), 69 Mont. 586, 591, 223 P. 489, 490, in which this Court stated the law as:

> The rule that knowledge gained by an agent of an insurance company as to matters within the general scope of his authority is imputable to the company does not require the citation of authority.

The jury was not required to determine whether Sebens' knowledge related to matters within the general scope of his authority. Bankers Life argues that there is substantial evidence to show that Mr. Sebens had acted as the agent insuring the plaintiffs for many years and that he therefore had two hats, the one being when he acted as agent for Bankers Life and the second when he acted for the plaintiffs. Under that circumstance, the jury should have been required to determine whether or not the knowledge being imputed to Bankers Life related to matters within the general scope of Sebens' authority.

In part IV, the majority addresses the question of coverage and examines the legal principles of estoppel, waiver, and fraud to determine if error was committed. With regard to promissory estoppel, the majority refers to Keil v. Glacier Park, Inc. (1980), 188 Mont. 455, 462, 614 P.2d 502, 506 where this Court defined the elements of promissory estoppel as:

> (1) [A] promise clear and unambiguous in its terms;
> (2) reliance on the promise by the party to whom the promise is made; (3) reasonableness and foreseeability of the reliance; (4) the party asserting the reliance must be injured by the reliance. (Citations omitted.)

The majority then refers to court's Instruction No. 22 which stated as follows with regard to promissory estoppel:

> A promise which Bankers Life Company should reasonably expect to induce action on the part of Kelley Tynes or Walt Tynes, and which does induce such action is binding if injustice can be avoided only by enforcement of the promise.

I conclude that the instruction does not adequately address the question of whether Bankers Life made a promise which was clear and unambiguous in its terms. The majority suggests that this may be found because Bankers Life treated Kelley as an insured when it paid some of the medical bills and represented to Wilson Center that Kelley was insured.

The Bankers Life letter to the Wilson Center contained the following statement as a last paragraph:

> However this is not a guarantee of benefits, the insured must meet the requirements of his policy before benefits will be payable on his claim. If you should have any further questions, please let us know.

That paragraph is sufficient to raise a factual issue as to whether or not there was a clear and unambiguous promise by Bankers Life. That element was not included in court's Instruction No. 22. I conclude that the jury instruction was incomplete and would require a modification of the instruction so that the jury would be required to determine whether or not all of the elements of promissory estoppel were present.

The majority next treats the question of waiver and concludes that because Bankers Life made an independent investigation of Kelley's employment status in 1978, Bankers Life could have been found by the jury to have relinquished any defense. The majority mentions that Bankers Life claims the facts of employment status were misrepresented. The

29

uncontradicted facts are stronger than that. There is no dispute that the written application submitted on behalf of Kelley to Bankers Life falsely stated facts entitling him to coverage. In addition, the undisputed evidence was that Kelley was not regularly scheduled to work at least 25 hours per week and in fact worked less than 25 hours per week during the applicable periods of time. The uncontradicted evidence is that Kelley was not under the facts of his employment and the contract in question entitled to coverage as an employee. Coverage is gained only if Bankers Life was estopped from raising, or waived the question of coverage. As pointed out in the majority opinion, Kelly v. Lovejoy (1977), 172 Mont. 516, 520, 565 P.2d 321, 324, defines waiver as follows:

> Waiver is generally defined as a voluntary and intentional relinquishment of a known right, claim or privilege . . . Waiver may be proved by express declarations or by a course or acts or conduct so as to induce the belief that the intention and purpose was to waive. (Citations omitted.)

I emphasize that the foregoing definition requires a determination that there has been a voluntary and intentional relinquishment of a known right. The second sentence refers to the matter of how that voluntary and intentional relinquishment of a known right is proved.

Court's Instruction No. 19 stated:

Instruction No. 19

> A waiver is defined as the intentional and voluntary relinquishment of a known right, claim or privilege. A waiver can also arise by conduct, in which case it is called an "implied waiver". An implied waiver can occur only if the party relies on the waiver to his detriment.
> If you find that Bankers Life Company, by its conduct, has waived its right to deny coverage to Kelley Tynes, and if you find further that Walt and Kelley Tynes relied on such waiver to their

30

detriment, then Bankers Life has waived its right to deny coverage.

The first sentence is correct. I believe the second sentence is an incorrect statement because it apparently allows waiver arising from conduct which causes the plaintiffs to rely on it, but without any reference to the intentional and voluntary relinquishment of a known right. The evidence demonstrates that Bankers Life did not realize that Kelley in fact could not qualify as an employee under the terms of the policy. As a result I conclude that the giving of the instruction was incorrect under the facts of this case.

Section 72-20-201, MCA, sets forth the trustee's obligation towards his beneficiary. That section of course pertains to the situation where a trust is present. I will not engage in an extended review of the cases discussed in the majority opinion. It seems clear to me that the statutory provisions set forth the standard which applies to a trustee. Bankers Life cannot properly be classed as that type of a trustee. I disagree with the conclusion that fiduciary duties as defined in the statute are simply a statement of the kind of good faith duties owed by an insurer to an insured. I conclude that this instruction should not have been given.

Justice

Chief Justice J. A. Turnage and Justice L. C. Gulbrandson concur in the foregoing dissent.

Chief

Justice

31